# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| STATE OF CONNECTICUT and | : | | |
| MASHANTUCKET PEQUOT TRIBE | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 17-2564 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 11, 18, 28, 30, 31, |
| | : | | 34, 44, 49 |
| UNITED STATES DEPARTMENT OF THE | : | | |
| INTERIOR and RYAN ZINKE, | : | | |
| *Secretary of the Interior*, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### Granting MGM's Motion to Intervene; Granting Federal Defendants' Motion to Dismiss

## I. INTRODUCTION

The approval and regulation of gambling (or "gaming") on Native American ("tribal") land requires a careful balancing of tribal, state, and federal law, and this action implicates that balance. Plaintiffs the state of Connecticut (the "state") and the Mashantucket Pequot Tribe ("Pequot") seek to amend the federally-imposed procedures authorizing gambling on Pequot land within Connecticut under the federal Indian Gaming Regulatory Act (the "IGRA"). This amendment is necessary for Pequot to operate a commercial casino on Connecticut land. The procedures require that Plaintiffs obtain the Secretary of the Interior's (the "Secretary") approval to amend them; approval the Secretary has withheld. Plaintiffs assert that the IGRA requires that the Secretary and the United States Department of the Interior (the "Department") (together, "Federal Defendants") deem the amendments approved, and they ask this Court to require the Secretary to publish a notice of approval in the Federal Register.

MGM Resorts Global Development, LLC ("MGM"), a multinational commercial casino operator, claims to have an interest in this action because the Secretary's approval of Plaintiffs' proposed amendments would give Pequot a competitive advantage over MGM in the market for commercial gambling in Connecticut and the surrounding states. First, MGM asserts that both it and Pequot have proposed the development of a casino in Bridgeport, Connecticut, and the state's approval of one proposal over the other largely hinges on the Secretary's decision at issue in this action. Second, MGM asserts that the Secretary's approval of Plaintiffs' proposed amendments would clear the final hurdle preventing the development of a casino in East Windsor, Connecticut that would directly compete with MGM's casino in Springfield, Massachusetts. Accordingly, MGM seeks to intervene as a defendant.

Now before the Court are Federal Defendants' motion to dismiss the action, MGM's motion to intervene as a defendant, and several related motions. For the reasons stated below, the Court will allow MGM to intervene as a defendant and it will dismiss Plaintiffs' complaint for failure to state a claim upon which relief may be granted.

## II. FACTUAL BACKGROUND

### A. Statutory and Regulatory Background

The IGRA governs Class III casino gaming—blackjack, roulette, and other table games—on tribal land. 25 U.S.C. §§ 2701 et seq.; 25 C.F.R. § 502.4; *Amador Cty., Cal. v. Salazar*, 640 F.3d 373, 376 (D.C. Cir. 2011). It mandates that a tribe must obtain authorization from a state before conducting Class III gaming on land within that state's borders. 25 U.S.C. § 2710(d)(1)(C). Typically, such authorization is secured through a negotiated agreement between the tribe and the state, a "tribal-state compact." 25 U.S.C. § 2710(d)(3)(A). However, the IGRA authorizes the Secretary to prescribe "procedures" ("secretarial procedures" or "procedures")

authorizing a tribe to conduct Class III gaming if the tribe and the state cannot reach an

agreement.  *See* 25 U.S.C. § 2710(d)(7)(B)(vii).[1]  The two forms of authorization—tribal-state

compacts and secretarial procedures—are governed by separate subsections of the IGRA as

follows.

## 1.  Tribal-State Compact

Section 2710(d)(8) governs the approval of tribal-state compacts, and 25 C.F.R. § 293.1

et seq. implement that section.  Section 2710(d)(8)(A) authorizes the Secretary to approve

compacts, and 25 C.F.R. § 293.3 further authorizes the Secretary to approve amendments to

those compacts.  The Secretary must either approve or disapprove a tribal-state compact and its

amendments within 45 days of receipt.  25 U.S.C. § 2710(d)(8)(A)–(C); 25 C.F.R. §§ 293.4(b),

293.12.  The Secretary may disapprove a compact or compact amendment for one of three

reasons: (1) it violates the IGRA, (2) it violates any other provision of Federal law that does not

relate to jurisdiction over gaming on tribal land, or (3) it violates the United States' trust

obligations to Native Americans.  25 U.S.C. § 2710(d)(8)(B); 25 C.F.R. § 293.14.  Importantly

for this action, if the Secretary fails to explicitly approve or disapprove a tribal-state compact or

amendment "described in subparagraph [2710(d)(8)(A)]" within 45 days, the compact or

amendment "shall be considered to have been approved by the Secretary . . . ."  25 U.S.C. §

2710(d)(8)(C); 25 C.F.R. § 293.12.

---

[1] MGM cites a 2015 Government Accountability Office report identifying more than 200 tribes that conduct casino gaming, only three of which rely on procedures authorizing that gaming.  MGM Mem. Supp. Fed. Defs. Mem. ("MGM Mem.") at 2 n.4 (citing U.S. General Accountability Office, Indian Gaming – Regulation and Oversight by the Federal Government, States, and Tribes ("GAO Report"), at 4, 11 n.24 (June 2015), https://www.gao.gov/assets/680/670603.pdf), ECF No. 21-1.

A tribal-state compact or compact amendment that has been approved by the Secretary or deemed approved by operation of law takes effect when notice of its approval is published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B); 25 C.F.R. § 293.15(a). And the Secretary "shall publish . . . notice of" the approval within 90 days from the date the compact or amendment was received by the Office of Indian Gaming.[2] 25 U.S.C. § 2710(d)(8)(D); 25 C.F.R. § 293.15. In other words, the Secretary may only disapprove a tribal-state compact or compact amendment within 45 days of its receipt, only for one of three specific reasons, and if the Secretary fails to disapprove the compact or compact amendment its approval must be promptly published in the Federal Register.

## 2. Secretarial Procedures

Section 2710(d)(7) governs the imposition of secretarial procedures for tribal gaming, when a tribe and a state cannot reach good faith agreement on a tribal-state compact. In the absence of an agreement, the tribe must first sue the state in federal court under 25 U.S.C. § 2710(d)(7)(A)(i). If the court concludes that the state failed to negotiate a compact in good faith, it shall order the parties to return to the negotiating table and produce a compact within 60 days. *Id*. § 2710(d)(7)(B)(iii). If the tribe and the state cannot reach agreement in 60 days, they "shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact." *Id*. § 2710(d)(7)(B)(iv).

When the tribe and the state are sent to mediation, the mediator must "select from the two proposed compacts the one which best comports with the terms of [the IGRA] and any other

---

[2] The Office of Indian Gaming is housed within the Department, and its "duties and responsibilities include the administrative review and analysis of the statutory and regulatory requirements of IGRA and related statutes, policy development, and technical assistance to tribal and state stakeholders." Office of Indian Gaming, Overview, https://www.bia.gov/as-ia/oig.

applicable Federal law and with the findings and order of the court," and submit the selected compact to the state and the tribe. *Id.* §§ 2710(d)(7)(B)(iv), (v). If the state agrees to the selected proposed compact, the proposal will be treated as a tribal-state compact under §§ 2710(d)(3) and 2710(d)(8). *Id.* § 2710(d)(7)(B)(vi). But if the state does not agree, the mediator must notify "the Secretary and the Secretary shall prescribe, in consultation with the Indian tribe, procedures" for Class III gaming activities "which are consistent with the proposed compact selected by the mediator . . . the provisions of [the IGRA], and the relevant provisions of the laws of the State." *Id.* § 2710(d)(7)(B)(vii). In summary, the remedial provisions of § 2710(d)(7) are designed to facilitate a tribal-state compact—at each step of the process the tribe and the state are given a new opportunity to negotiate—while authorizing the Secretary to impose gaming on a reluctant state if all else fails. The Department has not promulgated regulations implementing § 2710(d)(7), apart from regulations governing specific circumstances not present here.[3]

### B. Procedural History

This case originally involved two tribes, Pequot and the Mohegan Tribe of Indians of Connecticut ("Mohegan") (together, the "Tribes"), which both operate casinos in Connecticut. Pequot has operated under secretarial procedures since 1991 (the "Pequot Procedures"), having failed to agree on a tribal-state compact with the state. Compl. ¶ 25, ECF No. 1; *see also Mashantucket Pequot Tribe*, 913 F.2d at 1032–33; 56 Fed. Reg. 24,996 (May 31, 1991).

---

[3] The Department has promulgated regulations allowing the Secretary to prescribe secretarial procedures when a state raises an Eleventh Amendment sovereign immunity defense to a tribe's lawsuit alleging that the state did not negotiate in good faith. *See* 25 C.F.R. § 291.3 (describing the necessary elements for a tribe to request that the Secretary issue Class III gaming procedures). Those regulations do not apply here because the state did not assert an Eleventh Amendment defense to Pequot's lawsuit leading to the Pequot Procedures. *See Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1032 (2d Cir. 1990), *cert. denied*, 499 U.S. 975 (1991); *see also* 56 Fed. Reg. 15,746 (Apr. 17, 1991).

Mohegan, on the other hand, has operated under a tribal-state compact since 1994 (the "Mohegan Compact"). Compl. ¶ 24; 59 Fed. Reg. 65,130 (Dec. 16, 1994).[4]

Importantly, the Memoranda of Understanding implementing the Pequot Procedures and the Mohegan Compact mandate that the state receive up to thirty percent of the Tribes' gross operating revenues from certain gaming activities, and they also mandate that if the state permits "any other person" to operate such games, the state is no longer entitled to its royalty payments (the "exclusivity clauses"). *See generally* Pequot Procedures MOU; Mohegan Compact MOU. By their terms, both the Pequot Procedures and the Mohegan Compact may be amended only by written agreement of the tribe and the state, and the amendments do not become effective until the Secretary approves them and publishes notice of that approval in the Federal Register in accordance with 25 U.S.C. § 2710(d)(3)(B).[5] Pequot Procedures at 49–50; Mohegan Compact at 47.

In 2015, the Tribes agreed to form a joint venture, MMCT Venture LLC ("MMCT"), to build and operate an off-reservation, commercial casino in East Windsor, Connecticut. Decl. of Uri Clinton ("Clinton Decl.") ¶¶ 17–19, ECF No. 11-2; *see also* MMCT's Articles of Organization, Mem. Supp. MGM's Mot. Leave Intervene Supp. Defs. ("MGM Intervention

---

[4] The Pequot Procedures and Mohegan Compact, along with their Memoranda of Understanding ("MOU"), are available at http://www.portal.ct.gov/DCP/Gaming-Division/Gaming/Tribal-State-Compacts-and-Agreements (the "Pequot Procedures," "Pequot MOU," "Mohegan Compact," and "Mohegan MOU"). The Court may take judicial notice of these documents, as public records incorporated by reference in the complaint, without converting Federal Defendants' motion to dismiss to one for summary judgment. *See* Compl. ¶¶ 24–25, 27; Fed R. Civ. P. 12(b)(6); *Ruffin v. Gray*, 443 Fed. Appx. 562, 563 (D.C. Cir. 2011).

[5] This provision states that "[a]ny State and any Indian tribe may enter into a Tribal-State compact governing gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register." 25 U.S.C. § 2710(d)(3)(B).

Mem.") Ex. A, ECF No. 11-3. In 2017, having incorporated MMCT, the Tribes secured the casino project's conditional approval by Connecticut's General Assembly through the passage of Public Act 17-89.[6] 2017 Conn. Acts 17-89 (Reg. Sess.). Public Act 17-89 states that MMCT "is authorized to conduct authorized games at a casino . . . at 171 Bridge Street, East Windsor." *Id.* § 14(b).

The Act's legislative history suggests, and MGM asserts, that the Act was "precipitated by the development of the MGM property" in Springfield, Massachusetts; twelve miles from East Windsor. Senate Hearing on Public Act 17-89 Before the Gen. Assembly (Conn. 2017) (statement of Sen. Len Suzio);[7] MGM Intervention Mem. at 8–9, ECF No. 11-1. One legislator expressed a desire to protect the "regional monopoly" in "Native American gaming" that was "threatened by competition from . . . the very large MGM casino soon to open in Springfield." *Id.* (statement of Sen. Martin Looney). The same legislator stated that the East Windsor casino would be a "step in the process of helping to protect Connecticut jobs to continue to hold [the state's] niche in this important area." *Id.* And a second legislator stated that "if there's one driver behind [the Act], it's the potential loss of revenue immediately because MGM is up and open." *Id.* (statement of Sen. Steve Cassano).

---

[6] Public Act 17-89 is available at https://www.cga.ct.gov/2017/ACT/pa/pdf/2017PA-00089-R00SB-00957-PA.pdf. The Court takes judicial notice of this Act as a public record. *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of document posted on the District of Columbia's Retirement Board website); *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016) (taking judicial notice of "political and statistical facts that the Federal Election Commission has posted on the web").

[7] The transcript of this hearing is available at https://www.cga.ct.gov/2017/trn/S/2017STR00523-R00-TRN.htm. Again, the Court takes judicial notice of the transcript as a public record available on a government website. *Johnson*, 202 F. Supp. 3d at 167.

While the General Assembly agreed to approve the Tribes' East Windsor casino, the state legislators seemingly recognized that without appropriate safeguards the new casino would violate the exclusivity clauses of the Pequot Procedures and Mohegan Compact Memoranda of Understanding, because MMCT would be a non-tribal entity conducting gaming in Connecticut. Accordingly, Public Act 17-89 provides that its "authorization shall not be effective unless":

> (1) the Tribes and the state's governor execute "amendments to" the Pequot Procedures and the Mohegan Compact, and their memoranda of understanding, creating a special exemption for MMCT such that "authorization of MMCT . . . to conduct [casino] games in the state does not terminate" the Tribes' obligation to pay the State royalties from their gaming activities;
>
> (2) the amendments "are approved or deemed approved by the Secretary . . . pursuant to the [IGRA] . . . and its implementing regulations";
>
> (3)–(4) the amendments "are approved by" the Connecticut legislature; and
>
> (5) the Tribes pass resolutions providing that the state may sue the Tribes if MMCT fails to pay any fees or taxes due the state.

2017 Conn. Acts 17-89 § 14(c) (Reg. Sess.).

To satisfy the Act's conditions, the state and the Tribes agreed to amend the Pequot Procedures and Mohegan Compact to exempt MMCT from the exclusivity clauses. Compl. ¶ 27. During the amendment process the Tribes allegedly requested technical assistance from the Office of Indian Gaming, and according to Plaintiffs that Office "repeatedly informed representatives of the Tribes that it intended to approve" the amendments. *Id.* ¶¶ 28–31. The Tribes and the state approved and executed the amendments according to tribal and state law. *Id.* ¶ 33.

In late July and early August 2017, the Tribes requested that the Office of Indian Gaming formally approve the amendments, as required by the Pequot Procedures, the Mohegan Compact, and Public Act 17-89. *Id.* ¶ 32. Rather than approving the amendments, however, the Secretary "return[ed]" them to Plaintiffs "to maintain the status quo," stating:

We find that there is insufficient information upon which to make a decision as to whether a new casino operated by the Mohegan and Mashantucket Pequot Tribes (Tribes) would or would not violate the exclusivity clauses of the Gaming Compact [and Pequot Procedures]. The Tribes have entered an agreement with the State whereby they have agreed that the exclusivity [clauses] will not be breached by this arrangement. Therefore, our action is unnecessary at this time.

ECF Nos. 9-8, 9-16;[8] *see also* Compl. ¶ 37.

Having failed to secure the Secretary's approval of the amendments, Plaintiffs filed suit in this Court. They claim that because more than 90 days have passed since the Tribes submitted the amendments, the IGRA, 25 U.S.C. § 2710(d)(8), requires that the Secretary deem the amendments approved by law and publish notice of that approval in the Federal Register. *Id.* ¶¶ 41–60. Failure to do so, according to Plaintiffs, is arbitrary and capricious, not in accordance with law, and agency action unlawfully withheld, in violation of the Administrative Procedure Act, 5 U.S.C. § 706. *Id.* They seek an order (1) declaring that the Secretary acted in an arbitrary and capricious manner, in violation of the IGRA, by failing to treat the amendments as deemed approved; and (2) compelling the Secretary to publish notice of the amendments' deemed approval in the Federal Register. *Id.* at 12.

In mid-2018, the Secretary approved Plaintiffs' proposed amendments to the Mohegan Compact and published that approval in the Federal Register. *See* 83 Fed. Reg. 25,484; First Joint Status Report at 1, ECF No. 41. Because Mohegan has received the relief sought in the complaint, the parties stipulated to the dismissal of Mohegan's claims. *See generally* Stipulation of Dismissal, ECF No. 40. However, the Secretary has not approved Plaintiffs' proposed

---

[8] The Court takes judicial notice of these letters because they were incorporated by reference in the complaint. *See* Compl. ¶¶ 37; Fed R. Civ. P. 12(b)(6); *Ruffin*, 443 Fed. Appx. at 563.

amendments to the Pequot Procedures, so Pequot and the state continue to assert their claims against Federal Defendants.

### C. MGM's Involvement

MGM's interest in this action stems from its involvement in the commercial casino market in Connecticut and the surrounding states.[9] In 2014, MGM obtained a license to develop its Springfield, Massachusetts casino. Clinton Decl. ¶ 13. MGM spent four years and hundreds of millions of dollars building the facilities before opening the Springfield casino in 2018. *Id.* ¶¶ 13–16. In 2015, in the midst of Springfield construction, MGM also began seeking approval to develop and operate a commercial casino in southwestern Connecticut, near Bridgeport. Clinton Decl. ¶ 5.

In furtherance of their Connecticut proposal, and in opposition to the Tribes' East Windsor proposal, MGM urged the state to adopt a competitive selection process for the right to operate Connecticut's first commercial casino, rather than unilaterally grant the right to the Tribes through MMCT. *Id.* ¶ 6. Beginning in 2015, MGM lobbied for this process before the Connecticut General Assembly and in meetings with the Governor and other state leaders. *Id.* MGM spent more than $3.2 million in support of this legislative effort, *id.*, but despite MGM's lobbying the Connecticut General Assembly opted to pass Public Act 17-89 in 2017, conditionally authorizing MMCT to operate the proposed East Windsor casino as the state's first commercial casino. *See* 2017 Conn. Acts 17-89 § 14(b) (Reg. Sess.). As discussed above, the East Windsor casino site is a mere twelve miles south of MGM's Springfield casino, and it

---

[9] The Court will refer to casinos on tribal land as "tribal casinos," and casinos on state land as "commercial casinos."

appears to have been approved by the General Assembly, at least in part, because of its potential to compete with the Springfield casino. Clinton Decl. ¶ 17, 19.

Despite its setback before the General Assembly, in September 2017 MGM announced a proposed $675 million casino project in Bridgeport and it secured the contractual rights to a potential development site. *See* Clinton Decl. ¶¶ 8–9. MGM has also announced that it will seek legislative approval of the Bridgeport casino during the Connecticut General Assembly's 2018 session. Clinton Decl. ¶ 10. In December 2017, the Tribes announced their own Bridgeport casino project to compete with MGM's proposal. *See* Clinton Decl. ¶¶ 21–22.

\*            \*            \*

Before the Court are several ripe motions. Of greatest importance are (1) MGM's ripe motion to intervene as a defendant, by right or by permission (ECF No. 11); and (2) Federal Defendants' motion to dismiss (ECF No. 18).[10] The parties have also filed several ancillary motions. The Court will briefly address two of those motions now, and will consider the others while evaluating MGM's motion to intervene and Federal Defendants' motion to dismiss.

First, the Court grants Federal Defendants' motion to waive compliance with Local Civil Rule 7(n) because the Court need not consider the administrative record in evaluating the motions before it.[11] *See* Fed. Defs.' Mot. Relief Local Civil Rule 7(n), ECF No. 49. In so doing,

---

[10] Federal Defendants styled this motion as a "Motion for Partial Dismissal" because it seeks to dismiss only Pequot's claims, and when it was filed Mohegan's claims were still live. However, because Mohegan subsequently filed a stipulation of voluntary dismissal, Pequot's claims are now the only claims remaining and Federal Defendants' motion will dispose of the action entirely.

[11] Local Rule 7(n) states that "[i]n cases involving the judicial review of administrative agency actions, unless otherwise ordered by the Court, the agency must file a certified list of the contents of the administrative record with the Court within 30 days following service of the answer to the complaint or simultaneously with the filing of a dispositive motion, whichever occurs first."

the Court follows the practice of other courts in this jurisdiction when "the administrative record is not necessary for [the court's] decision" regarding a motion to dismiss. *Mdewakanton Sioux Indians of Minn. v. Zinke*, 264 F. Supp. 3d 116, 123 n.12 (D.D.C. 2017); *see also PETA v. U.S. Fish & Wildlife Serv.*, 59 F. Supp. 3d 91, 94 n.2 (D.D.C. 2014).

Second, the Court denies Plaintiffs' motion to amend the briefing schedule because Plaintiffs' proposed schedule would not further the Court's efficient resolution of this action. *See* Pls.' Mot. Amend Briefing Schedule, ECF No. 31. Under the current schedule, Plaintiffs' pending motion for summary judgment is stayed until 30 days after a denial of Federal Defendants' motion to dismiss. *See* Order Granting Joint Motion Modify Briefing Schedule, ECF No. 17. Plaintiffs now urge the Court to consider their motion for summary judgment simultaneously with Federal Defendants' motion to dismiss because, Plaintiffs claim, the motions raise certain common legal issues. Pls. Mot. Amend Briefing Schedule at 6. This may be true, but Plaintiffs' motion raises additional issues not raised by Federal Defendants' motion, and Plaintiffs have not provided sufficient justification for the Court to deviate from the normal course of APA proceedings, under which courts dispose of motions to dismiss before considering the parties' cross-motions for summary judgment supported by the administrative record.

## III. LEGAL STANDARDS

### A. Federal Rule 24(a) Intervention as of Right

"The right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 130 (D.C. Cir. 1972). Specifically, Rule 24(a) provides that:

> [u]pon timely application anyone shall be permitted to intervene in an action . . .
> when the applicant claims an interest relating to the property or transaction which

is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a).

The D.C. Circuit has established that the right to intervene under Rule 24(a) depends on the applicant's ability to satisfy four factors: (1) whether the motion to intervene was timely; (2) whether the applicant claims an interest relating to the property or transaction that is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties. *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003) (citations omitted); *see also Jones v. Prince George's Cty., Md.*, 348 F.3d 1014, 1017 (D.C. Cir. 2003) (listing the four elements of Rule 24(a) as "timeliness, interest, impairment of interest, and adequacy of representation"). In addition, an applicant seeking to intervene as of right under Rule 24(a) must possess Article III standing to participate in the lawsuit. *See Jones*, 348 F.3d at 1017; *Fund for Animals*, 322 F.3d at 731–32.

## B. Administrative Procedure Act, 5 U.S.C. § 706(1)

The APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). "Unlike the provision that instructs courts to 'set aside' unlawful agency action, *id*. § 706(2), the § 706(1) provision 'provides relief for a failure to act[.]'" *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) (citing *Norton v. S. Utah Wilderness All. ("SUWA"*), 542 U.S. 62 (2004)). However, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *SUWA*, 542 U.S. at 64. "The 'law' that generates a mandatory

duty need not be a statute—it can also be an 'agency regulation[ ] that ha[s] the force of law[.]'" *Ctr. for Biological Diversity*, 260 F. Supp. 3d at 21 (quoting *SUWA*, 542 U.S. at 64); *accord SAI v. DHS*, 149 F. Supp. 3d 99, 119 (D.D.C. 2015). In sum, a plaintiff who asks a court to "compel agency action . . . unreasonably delayed" under § 706(1) must pinpoint an agency's failure to take an action that is both discrete and mandatory. *See SUWA*, 542 U.S. at 64.

## C. Federal Rule 12(b)(6)

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). It is not necessary for the plaintiff to plead all elements of a prima facie case in the complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 at 544 (citations omitted). "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

If a complaint containing an APA claim under 5 U.S.C. § 706(1) fails to identify a discrete and mandatory agency duty, the court must grant the defendant's Rule 12(b)(6) motion and dismiss the claim. *See, e.g., Anglers Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 439–41 (D.D.C. 2014), *aff'd*, 809 F.3d 664 (D.C. Cir. 2016); *see also Sierra Club v. Jackson*, 648 F.3d 848, 853–54 (D.C. Cir. 2011) (explaining that whether a plaintiff has adequately pleaded a predicate agency duty is properly analyzed under Rule 12(b)(6), not Rule 12(b)(1)).

## IV. MGM'S MOTION TO INTERVENE

The Court first addresses MGM's motion to intervene. "Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections." *WildEarth Guardians v. Salazar*, 272 F.R.D. 4, 9 (D.D.C. 2010) (quoting *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001)); *see also Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) ("[M]otions to intervene are usually evaluated on the basis of well pleaded matters in the motion, the complaint, and any responses of opponents to intervention."). As discussed above, in determining whether MGM has the right to intervene as a defendant, the Court must first determine whether MGM has Article III standing to participate in the lawsuit. *Jones*, 348 F.3d at 1017. If MGM has standing, Federal Rule 24(a) dictates that the Court must consider "timeliness, interest, impairment of interest, and adequacy of

representation." *Id*. These factors dictate that MGM may intervene in this action as a matter of right.[12]

## A. Standing

Before reaching the Rule 24(a) factors, the Court must consider whether MGM has Article III standing to participate in the lawsuit. "It is axiomatic that Article III requires a showing of injury-in-fact, causation, and redressability." *Deutsche Bank Nat. Trust,* 717 F.3d at 193. The Court concludes that MGM meets all three requirements here.

## 1. Injury-in-Fact

First, the Court must determine whether MGM will suffer injury-in-fact if Plaintiffs succeed in this action. In *Lujan v. Defs. of Wildlife,* 504 U.S. 555 (1992), the Supreme Court described the injury-in-fact element as requiring a showing of an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Id.* at 560. "Where, as here, a party seeks to intervene as a defendant to uphold an action taken by the government, the party must establish that it will be 'injured in fact by the setting aside of the government's action it seeks to defend, that this injury would have been caused by that invalidation, and the injury would be prevented if the government action is upheld.'" *Forest Cty. Potawatomi Cmty. v. United States ("Forest County I")*, 317 F.R.D. 6, 11 (D.D.C. 2015); (citing *Am. Horse Prot. Ass'n, Inc. v. Veneman*, 200 F.R.D. 153, 156 (D.D.C. 2001)). The Court concludes that MGM has met those elements here.

---

[12] Because the Court concludes that MGM is entitled to intervene as a matter of right, the Court finds it unnecessary to determine whether MGM is also entitled to intervene by permission pursuant to Federal Rule 24(b). *See Forest Cty. Potawatomi Cmty. v. United States ("Forest County I")*, 317 F.R.D. 6, 10 (D.D.C. 2015) (concluding that movant was entitled to intervene as of right and declining to reach the question of permissive intervention).

MGM's injury-in-fact argument is two pronged.  First, it argues that the amendments to the Pequot Procedures would "allow MMCT to open new commercial casinos without depriving the State of hundreds of millions in annual royalty payments, thus giving the State an incentive to prefer MMCT's proposals (in Bridgeport or elsewhere) over MGM's."  MGM Intervention Mem. at 15.  Second, it argues that the amendments would "activate MMCT's exclusive right to operate a new commercial casino in East Windsor, thus creating new . . . competition just 12 miles from MGM Springfield."  *Id.*  Relying heavily on a recent case in this jurisdiction, *Forest County I*, MGM argues that it has standing "because approval of the amendments would put MGM's casino projects at a disadvantage vis-à-vis the Tribes' competing proposals."  *Id.* at 13.  MGM also argues that it has standing under the "competitor standing doctrine" because "an order requiring [the Secretary] to approve the Amendments would expose MGM to added competition."  *Id.* at 15.  The Court agrees that MGM would be sufficiently injured by the relief sought by Plaintiffs—the Secretary's approval of Plaintiffs' proposed amendments to the Pequot Procedures—to convey standing to intervene.

MGM persuasively argues that *Forest County I* should guide this Court's analysis with respect to MGM's ability to compete for casino projects in Connecticut, despite Defendants' vigorous attempts to distinguish the case.  *Forest County I* involved the Forest County Potawatomi Community's ("the "Potawatomi") challenge to the Secretary's decision to disapprove, under the IGRA, an amendment to a tribal-state compact between Potawatomi and the state of Wisconsin.  317 F.R.D. at 8.  The amendment included a provision that would have required the state to compensate Potawatomi for lost revenue if any other tribe secured land for gaming purposes within 50 miles of Potawatomi's existing gaming facility in Milwaukee, Wisconsin.  *Id.* at 9.  In other words, the provision would have created a "50-mile non-

competition zone" around Potawatomi's facility.  *Id*.  In disapproving the amendment, the Secretary noted that the amendment would improperly obligate the Menominee Indian Tribe of Wisconsin "to compensate Potawatomi for lost revenue resulting from a proposed Menominee casino in Kenosha, Wisconsin, approximately thirty-three miles from [the] Potawatomi gaming facility."  *Id*.  Menominee's proposed casino required gubernatorial approval to become operational.  *Id*.

Menominee sought to intervene as a defendant as a matter of right, claiming that if—as Potawatomi sought—the proposed amendment "were to be approved or deemed approved, it would have a direct and harmful impact on the rights and interests of [Menominee] in conducting games in Kenosha."  *Id*. at 10.  The Court noted that "the Menominee have attempted for years to develop a gaming facility on land in Kenosha . . . [and] Menominee will continue [its] efforts in the future."  *Id*. at 11.  However, Potawatomi's proposed non-competition zone would greatly increase the cost of approving Menominee's casino because it would obligate the state to offset Potawatomi's lost revenue.  *Id*.  Therefore, Potawatomi's "requested relief, if granted, would, as a practical matter, impede [Menominee's] efforts to obtain a gubernatorial concurrence and would thereby impede their efforts to develop a gaming facility in Kenosha."  *Id*. at 12.  The court concluded that this competitive harm was sufficient to convey standing for Menominee to intervene.  *Id*.

For the same reason that Menominee had standing to intervene in *Forest County I*, MGM has standing to intervene here.  Like Potawatomi in *Forest County I*, which sought to overturn the Secretary's disapproval of a favorable amendment to its tribal-state compact, Plaintiffs seek to overturn the Secretary's failure to approve a compact amendment that would give the Tribes an advantage in the state commercial casino market over private casino developers like MGM.

While the Tribes' immediate plan is to build the East Windsor casino, the amendments are worded such that MMCT could build casinos elsewhere in the state without causing the state to forfeit the royalty payments it receives from the tribal casinos' gaming operations; payments the state would forfeit if it approved casinos operated by private developers in Bridgeport or elsewhere in the state. *See* MGM Intervention Mem. Ex. C, ECF No. 11-5. As MGM notes, it appears that the Tribes plan to put that advantage to use in competing with MGM for approval of a casino in Bridgeport. *See* Clinton Decl. at ¶¶ 21–22; Brian Hallenbeck, *MGM Urges Competitive Bidding for a Bridgeport Casino*, The Day (Dec. 7, 2017).[13] "[A] decision by this Court granting [Plaintiffs'] requested relief would put [MGM] at a 'competitive disadvantage when seeking state approval for off-reservation gaming,'" and "[s]uch an alteration in competitive conditions 'clearly amounts to a concrete injury.'" *Forest County I*, 317 F.R.D. at 12 (quoting *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 497 (7th Cir. 2005)).

MGM also persuasively argues that the competitor standing doctrine applies here because the reversal of the Secretary's decision would create new competition for MGM's Springfield casino. MGM Intervention Mem. at 15. The competitor-standing doctrine recognizes that an economic actor "suffer[s] [an] injury in fact when agencies lift regulatory restrictions on [its] competitors or otherwise allow increased competition" against it. *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (internal quotation marks omitted) (quoting *La. Energy & Power Auth. v.*

---

[13] Available at http://www.theday.com/business/20171207/mgm-urges-competitive-bidding-for-bridgeport-casino. The Court may take judicial notice of this news article for the purpose of evaluating MGM's standing to intervene. *Magritz v. Ozaukee Cty.*, 894 F. Supp. 2d 34, 35 n.1 (D.D.C. 2012); *accord Mendoza v. Perez*, 754 F.3d 1002, 1016 n.9 (D.C. Cir. 2014) (noting that a court may consider "relevant facts found outside of the complaint" when evaluating a Rule 12(b)(1) motion to dismiss for lack of standing).

*FERC,* 141 F.3d 364, 367 (D.C. Cir. 1998)); *see also Canadian Lumber Trade All. v. United States,* 517 F.3d 1319, 1332 (Fed. Cir. 2008) (holding that the doctrine "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors").  For instance, in *Sherley*, this Circuit held that researchers had standing to challenge an agency rule that would allow government funding of new types of research, which would increase competition for funding and restrict the plaintiffs' ability to receive funding for their projects.  610 F.3d at 72–74.  The Circuit "[saw] no reason any one competing for a governmental benefit should not be able to assert competitor standing when the Government takes a step that benefits his rival and therefore injures him economically."  *Id*. at 72.

While competitor standing cases occasionally involve competition for a government benefit, "competitor standing need not involve a government benefit at all."  *Air Transp. Ass'n of Am. ("ATA") v. Export-Import Bank of the U.S.*, 878 F. Supp. 2d 42, 57–58 (D.D.C. 2012), *rev'd on other grounds*, *Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 718 F.3d 974 (D.C. Cir. 2013).  For instance, the Supreme Court has held that "competitors of financial institutions have standing to challenge agency action relaxing statutory restrictions on the activities of those institutions." *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998).  Similarly, in *Mova Pharm. Corp. v. Shalala*, this Circuit held that a pioneer drug manufacturer had standing to intervene as a defendant in support of an FDA rule governing how generic drug manufacturers could enter and compete in the pioneer drug's market.  *Id*., 140 F.3d 1060, 1074 (D.C. Cir. 1998).  These cases make clear that "[t]he logic of the competitor-standing doctrine . . . is that a plaintiff is injured by *increased competition*."  *ATA*, 878 F. Supp. 2d at 62.

Applying these principles here, MGM has competitor standing to defend the Secretary's decision to not approve the proposed amendments to the Pequot Procedures. The parties agree that Public Act 17-89 conditionally authorizes the Tribes to operate the East Windsor casino, and that the only condition remaining to be fulfilled is the Secretary's approval of the proposed amendments to the Pequot Procedures. *See* Fed. Defs. Opp'n MGM's Mot. Intervene ("Fed. Defs. Intervention Opp'n") at 10–11, ECF No. 22. In other words, if the Secretary is ordered to deem the amendments approved, MGM's Springfield casino will face an "imminent increase in competition" from the Tribes' casino less than twenty miles away; the core injury-in-fact underlying competitor standing. *Am. Inst. of Certified Pub. Accountants v. IRS*, 804 F.3d 1193, 1197–98 (D.C. Cir. 2015) (holding that an association of certified accountants and accounting firms had competitor standing to challenge an IRS rule allowing "unenrolled preparers" to gain certain credentials and list their practices in the IRS's directory, making it easier for them to compete with the plaintiffs).

The parties' attempts to undercut MGM's injury-in-fact theories are unpersuasive. First, Federal Defendants argue that "MGM has not shown that a casino to be developed by the Tribes in another state would necessarily draw customers away from MGM Springfield." Fed. Defs. Intervention Opp'n at 7. However, as noted above, Public Act 17-89's legislative history suggests that the Act was passed *because* the Tribes' casino would compete with MGM Springfield. Moreover, as MGM notes, MGM Intervention Mem. at 12 n.12, the Tribes have presented expert testimony to the state's General Assembly discussing the "competitive threat" of the Springfield casino to Connecticut's casinos. *See* Statement of Dr. Clyde W. Barrow, Hearing Before the J. Comm. on Finance, Revenue, and Bonding, Gen. Assembly at 1-3 (Conn.

2017).[14]  And apart from the record evidence, "[b]asic economic logic" suggests that two large casinos within fifteen miles of one another would compete for patrons.  *Am. Inst. of Certified Pub. Accountants*, 804 F.3d at 1198 (citing *United Transp. Union v. ICC,* 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (noting that allegations of competitive harm founded on basic economic logic can establish standing)).[15]  Accordingly, MGM has sufficiently asserted, at this stage, that the Tribes' East Windsor casino would compete with MGM's Springfield casino.

Second, the parties argue that Public Act 17-89—rather than the proposed amendments to the Pequot Procedures—authorizes the East Windsor casino, and therefore that MGM's alleged competitive harm would arise from the passage of Public Act 17-89, not the Secretary's approval of the Pequot Procedures.  Mohegan & Pequot Opp'n MGM's Mot. Intervene ("Tribes Intervention Opp'n") at 17–18, ECF No. 23;[16] Fed. Defs. Intervention Opp'n at 10–11.  In other words, the parties assert that MGM's alleged injuries are too "conjectural or hypothetical" to support standing with respect to the Secretary's decision.  Tribes Intervention Opp'n at 18 (quoting *Daimler-Chrysler Corp. v. Cuno*, 547 U.S. 332, 344-45 (2006)).  The parties similarly argue that the competitor standing doctrine is inapplicable because it concerns agency actions

---

[14] Available at https://www.cga.ct.gov/2017/findata/tmy/2017HB-07319-R000417-Barrow,%20PH.D.,%20Clyde,%20Chair-Department%20of%20Political%20Science-University%20of%20Texas%20Rio%20Grande%20Valley-TMY.PDF.

[15] The Tribes' East Windsor casino is particularly likely to pose a competitive threat to MGM's Springfield casino because citizens of Hartford, one of Connecticut's largest cities, must drive past East Windsor to visit Springfield.  The Court takes judicial notice of these facts as accurately and readily determinable from sources whose accuracy cannot reasonably be questioned.  *See* Fed. R. Evid. 201(b)(2); *Onondaga Nation v. New York*, 500 Fed. Appx. 87, 89–90 (2d. Cir. 2012) (holding that it was not "inappropriate for the district court to take judicial notice of population and development").

[16] The Tribes and the state filed separate briefs opposing MGM's motion to intervene, and the state's brief adopts the arguments set forth in the Tribes' brief.  *See* Pl. Conn.'s Opp'n MGM's Mot. Intervene, ECF No. 26.  The Court will accordingly refer to the Tribes' arguments regarding MGM's intervention as "Plaintiffs'" arguments.

that "directly affect[] the market," and here the Connecticut legislature's actions, rather than the Secretary's decision, would impact the commercial casino market and cause MGM's alleged injuries. Fed. Defs. Intervention Opp'n at 8–9; Tribes Intervention Opp'n at 15–16. In service of these arguments, Plaintiffs analogize this case to *Delta Air Lines, Inc. v. Export-Import Bank of U.S.*, 85 F. Supp. 3d 250 (D.D.C. 2015). In that case, the plaintiff challenged certain "economic impact procedures" ("EIPs") adopted by the Export-Import Bank, asserting that it had standing because the EIPs would provide certain financial advantages to its foreign competitors. *Id*. at 260–61. This Court held that the plaintiff lacked standing because when the suit was filed the EIPs had not yet become operative or been applied to a specific financial transaction, and therefore "the prospect and nature of future competition remain[ed] indeterminable and amorphous." *Id*. at 263–67.

Here, however, unlike the inoperative EIPs challenged in *Delta Air Lines*, Public Act 17-89 has been passed by Connecticut's legislature. MGM does not assert "conjectural or hypothetical" injuries based on future legislative action; the necessary legislative action has already occurred and the Secretary's approval of the proposed amendments to the Pequot Procedures has "'the clear and immediate potential' to cause competitive harm" to MGM by triggering the construction of the East Windsor casino. *Id*. at 262 (citing *Associated Gas Distribs. v. FERC,* 899 F.2d 1250, 1259 (D.C. Cir. 1990)); *see also ATA*, 878 F. Supp. 2d at 57–58 (holding that the plaintiff had standing to challenge the Export-Import Bank's EIPs where the plaintiff identified specific transactions under those EIPs which benefited a foreign competitor).

Put another way, reversal of the Secretary's decision here would "directly affect the market" by removing the final hurdle to development of the East Windsor casino.[17]

Third, the parties unsuccessfully attempt to distinguish *Forest County I*.  Federal Defendants assert that MGM's alleged injury from increased competition for legislative approval of its Bridgeport casino is "far less direct" than Menominee's injury in *Forest County I* because if the Secretary's decision is overturned here, MGM must still seek approval from "a local government and the Connecticut legislature" to enter the commercial casino market.  Fed. Defs. Intervention Opp'n at 13–14; Tribes Intervention Opp'n at 14.[18]  However, Federal Defendants admit in their brief that the Secretary's decision at issue in *Forest County I* would "have a direct and concrete impact on [Menominee] by . . . making it less likely that the governor would approve [Menominee's] proposed gaming facility."  Fed. Defs. Intervention Opp'n at 13.  Similarly, approval of the amendments here would make it less likely that the state will approve MGM's Bridgeport casino.  *Cf. La. Energy & Power Auth.,* 141 F.3d at 367 (holding that a company had standing to challenge an agency rule relaxing price restrictions on a competitor because the plaintiff "will be injured by increased price competition").

---

[17] Plaintiffs similarly argue that MGM's competitive injury from the East Windsor casino cannot be redressed by the Court's decision here, because that injury arises from the passage of Public Act 17-89 rather than the approval of the amendments to the Pequot Procedures.  Tribes Intervention Opp'n at 19–20.  That argument is not persuasive, for the reasons described in previous paragraphs.

[18] Plaintiffs also claim that "MGM's Bridgeport plans appear to be neither concrete nor imminent," citing a late-2017 news article quoting MGM's CEO as stating that MGM's Springfield casino will be MGM's "last major development project" in the United States.  Tribes Intervention Opp'n at 6–7.  While the Court agrees that MGM's Bridgeport casino project is potentially speculative, a single news article is not sufficient to suggest that MGM's declaration is frivolous or a sham regarding MGM's plans.  *Forest County I*, 317 F.R.D. at 9 ("Courts are to take . . . declarations supporting the motion [for intervention] as true absent sham, frivolity or other objections.") (quoting *Sw. Ctr. for Biological Diversity*, 268 F.3d at 820).

The parties also argue that the issue raised by *Forest County I* and this case—the proper administration of the IGRA—concerned Menominee as a tribe subject to IGRA oversight but does not concern MGM as a private casino operator not regulated by the IGRA. *See* Tribes Intervention Opp'n at 11–12; Fed. Defs. Intervention Opp'n at 14–15. However, the *Forest County I* court did not consider that fact when evaluating Menominee's standing, and this Court fails to see its significance to MGM's standing, given that the amendments will impact the regional commercial casino market in which MGM is an active participant.[19] The Secretary's "duty to facilitate . . . gaming opportunities" to tribes, Tribes Intervention Opp'n at 11–12, may have been relevant to the Secretary's decision to disapprove the amendments at issue in *Forest County I*, but it was not relevant to Menominee's potential injury from the reversal of that decision, and it is not relevant to MGM's potential injury here. In proposing amendments that would place MGM at a "competitive disadvantage when seeking state approval for off-reservation gaming," Plaintiffs have created a circumstance in which MGM is entitled to be involved in the interpretation of a law intended to facilitate on-reservation gaming. *Forest County I*, 317 F.R.D. at 12.

### 2. Causation and Redressability

Second, the Court must determine whether MGM's "injury would have been caused by th[e] invalidation [of the Secretary's decision], and the injury would be prevented if the

---

[19] As MGM notes, the amendments themselves state that they seek to help the Tribes "own and operate a commercial casino" without impacting "any benefits derived" by the state and the Tribes from the current tribal gaming arrangements. MGM Intervention Mem. Ex. C at 4, ECF No. 11-5. Again, the Court takes judicial notice of the amendments because they are incorporated by reference in the complaint. *See* Compl. ¶¶ 32–34; Fed R. Civ. P. 12(b)(6); *Ruffin*, 443 Fed. Appx. at 563.

government action is upheld." *Am. Horse Prot. Ass'n,* 200 F.R.D. at 156. The Court concludes that MGM meets this standard.

A decision upholding the Secretary's non-approval of proposed amendments to the Pequot Procedures would, as stated in the Secretary's letters to the Tribes, maintain the status quo in the state's commercial casino market. Under the status quo, a commercial casino proposal submitted by either MGM or MMCT and approved by the General Assembly would run afoul of the Tribes' exclusivity clauses. MGM and the Tribes would therefore be on equal competitive footing lobbying the state legislature for its approval. A decision upholding the Secretary's action would also stall the authorization of the Tribes' East Windsor casino, and thus prevent MGM's Springfield casino from facing new competition.

On the other hand, a decision ordering the Secretary to approve the amendments would exempt MMCT from the exclusivity clauses in both the Mohegan Compact and the Pequot Procedures, and therefore allow the state to approve MMCT's Bridgeport casino without losing its royalties from the Tribes' casinos. The decision would also satisfy the final unfulfilled condition of Public Act 17-89, and therefore immediately authorize the Tribes' development of the East Windsor casino to compete with MGM's Springfield casino. The decision would thus cause MGM's competitive injury described above. *See La. Energy & Power Auth.*, 141 F.3d at 404 (holding that the plaintiff's competitive injury from increased price competition due to a FERC order "would be redressed by a favorable decision of this court vacating FERC's order"); *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.,* 724 F.3d 206, 212 (D.C. Cir. 2013) ("The causation and redressability requirements of Article III standing are easily satisfied because, absent the [challenged regulation], [the plaintiffs] would not be subject to increased competition from Mexico-domiciled trucks operating throughout the United States.").

Refusing to concede this point, both parties rely on *New World Radio, Inc. v. FCC*, 294 F.3d 164 (D.C. Cir. 2002), to argue that MGM lacks standing because even if the Court reverses the Secretary's decision, MGM will have another opportunity to avoid injury when it lobbies the Connecticut legislature on behalf of its casino projects and against the Tribes' projects. *See* Tribes Intervention Opp'n at 18; Fed. Defs. Intervention Opp'n at 6. In *New World Radio*, the D.C. Circuit held that a radio station did not have standing to challenge the FCC's renewal of another station's license when that station was in a different city. *New World Radio*, 294 F.3d at 171. The Circuit reasoned that the plaintiff lacked standing because the "'competitive injury' w[ould] occur, if at all, only if [the competitor] subsequently s[ought] and secure[d] the relocation of its Pocomoke City broadcast license to the Washington, D.C. programming area," and therefore the decision at issue was "at most, the first step in the direction of future competition." *Id.*

The parties' reliance on *New World Radio* misses the mark here. If the Secretary is required to approve the proposed amendments to the Pequot Procedures—as sought by Plaintiffs—MGM will immediately lose its ability to lobby the Connecticut legislature for casino approval on equal footing with the Tribes. *See Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1499 (D.C. Cir. 1996) ("[T]he injury claimed is exposure to competition as a result of the FDA's [rule] . . . it is no answer to say that the FDA is merely permitting a competitive product to enter the market and leaving the purchasing decision to the consumer."). And the Connecticut legislature has already approved the Tribes' East Windsor casino, conditioned on the Secretary's decision at issue here. The Secretary's decision, therefore, is not the first step towards increased competition for the state's next commercial casino and MGM's Springfield casino, but rather the only step.

The other cases cited by the parties are no more helpful than *New World Radio* because they involved far more speculative harm than that faced by MGM here. *See Arpaio*, 979 F.3d at 20 (rejecting the plaintiff sheriff's standing theory that individuals, in incorrect reliance on two challenged statutes, would illegally enter the United States and commit crimes in a particular county, requiring the plaintiff to expend resources); *NW Airlines, Inc. v. FAA*, 795 F.2d 195, 201 (D.C. Cir. 1986) (holding that an airline did not have standing to challenge an agency's certification of an individual pilot, because the plaintiff did not show "that [the pilot was] hired by any other airline" and "[e]ven if he [was] employed elsewhere, the possibility that he w[ould] fly in areas in which [the plaintiff] maintain[ed] routes and actually cause injury to [the plaintiff's] passengers and crew [was] too remote and speculative to constitute injury"). Here, the Court need not make a hypothetical leap; the amendments will immediately harm MGM's bargaining position with the state vis-à-vis the Tribes and will immediately authorize additional competition for MGM's Springfield casino. A court order upholding the non-approval of those amendments will preserve the current parity in the market for commercial casino approval in Connecticut and will preserve the current competitive position of MGM's Springfield casino. *See Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 339–42 (D.C. Cir. 2018) (holding that a union representing domestic Science, Technology, Engineering and Mathematics ("STEM") workers had standing to challenge a DHS immigration-related regulation that would increase competition for domestic STEM jobs).

With respect to redressability, the parties repeat many of the arguments addressed by the Court above. Plaintiffs also contend that "a ruling in this case cannot redress MGM's alleged injuries it thinks will be caused by a State regulatory scheme." Tribes Intervention Opp'n at 21. However, MGM does not claim that the injury will be "caused" by the state's scheme, but rather

that the injury will arise from MGM's ability to compete within that scheme. A ruling upholding the Secretary's decision would (1) preserve MGM's ability to compete with the Tribes on equal footing for the right to build a Bridgeport casino, because it would prevent the Tribes from gaining an advantage; and (2) preserve the current competitive position of MGM's Springfield casino, because it would prevent the introduction of a competitor. The ruling would therefore redress MGM's potential injury-in-fact.

## B. Timeliness

Having determined that MGM has standing to intervene, the Court now considers the first Federal Rule 24(a) factor; whether MGM's motion was timely. The timeliness of a motion to intervene must "'be judged in consideration of all the circumstances.'" *Smoke v. Norton,* 252 F.3d 468, 471 (D.C. Cir. 2001) (quoting *United States v. AT&T,* 642 F.2d 1285, 1295 (D.C. Cir. 1980)). "[T]he requirement of timeliness is aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties." *Roane v. Leonhart,* 741 F.3d 147, 151 (D.C. Cir. 2014) (internal citations, quotation marks, and alterations omitted). The parties do not argue that MGM's motion to intervene was untimely. Nor could they, because the motion was filed within a month of when Plaintiffs filed the complaint, and before Federal Defendants entered an appearance. Under the circumstances the Court concludes that MGM's intervention would not unduly disrupt the litigation, particularly since MGM has filed provisional briefs as the action has proceeded.

## C. Interests

The second and third Rule 24(a) factors require the Court to consider whether MGM has demonstrated "a legally protected interest in the action," which has been impaired. *SEC v. Prudential Sec. Inc.,* 136 F.3d 153, 156 (D.C. Cir. 1998). This "test operates in large part as a

'practical guide,' with the aim of disposing of disputes with as many concerned parties as may be compatible with efficiency and due process." *100Reporters LLC v. DOJ*, 307 F.R.D. 269, 275 (D.D.C. 2014) (quoting *Wildearth Guardians,* 272 F.R.D. at 12–13). In determining whether an applicant's interests will be impaired, courts in this jurisdiction look to the practical consequences that the applicant may suffer if intervention is denied. *See Nat. Res. Def. Council v. Costle,* 561 F.2d 904, 909 (D.C. Cir. 1977); *Am. Horse Prot. Ass'n,* 200 F.R.D. at 158.

Federal Defendants and MGM acknowledge that where, as here, a prospective intervenor "has constitutional standing, it *a fortiori* has 'an interest relating to the property or transaction which is the subject of the action.'" *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 320 (D.C. Cir. 2015) (quoting Fed. R. Civ. P. 24(a)); *see also Safari Club Int'l v. Salazar*, 281 F.R.D. 32, 38 (D.D.C. 2012) ("The injury-in-fact and causation connection with the challenged action requirements for standing are closely related to the second and third factors under Rule 24(a)"). For the same reasons MGM has standing to intervene—reversal of the Secretary's decision would immediately diminish MGM's chances of securing state approval for its Bridgeport casino proposal over the Tribes' competing proposal, and would create imminent competition for MGM's Springfield casino—MGM has demonstrated a legally protected interest in the action that may be impaired if intervention is denied.

### D. Adequate Representation of Interests

Finally, Rule 24(a) requires that the Court consider whether MGM's interests would be adequately represented by Federal Defendants. The Supreme Court has explained that the adequate representation "requirement of [Rule 24(a)] is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n.10 (1972); *see*

*also Fund for Animals,* 322 F.3d at 735–36.  Similarly, the D.C. Circuit has described this

requirement as "not onerous."  *Dimond v. District of Columbia,* 792 F.2d 179, 192 (D.C. Cir.

1986); *see also AT&T,* 642 F.2d at 1293 (stating that an applicant "'ordinarily should be allowed

to intervene unless it is clear that the party will provide adequate representation for the

absentee'" (quoting 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure

§ 1909 (1st ed.1972))).  While in cases such as this the intervenor and the government may agree

on a legal position or course of action, the D.C. Circuit nonetheless "often [has] concluded that

governmental entities do not adequately represent the interests of aspiring intervenors."  *Fund for

Animals,* 322 F.3d at 736.  This is primarily because the government entity's overarching

"obligation is to represent the interests of the American people," while the intervenor's obligation

is to represent its own interests.  *Id.*

Here, the Court agrees with MGM that "[the Secretary's] duty to serve the public and its

trust obligations to the Tribes are distinct from MGM's commercial considerations, which could

lead to different positions in litigating this case."  MGM Intervention Mem. at 18.  Federal

Defendants' trust obligation to the Tribes is particularly relevant, because the tribes are MGM's

competitors.  *See* Tribes Intervention Opp'n at 5 (discussing the Secretary's "fiduciary

responsibility to the Tribes").  "The fact that [MGM] and [Federal Defendants] presently agree

on a litigation posture does not mean that [Federal Defendants] necessarily will adequately

represent [MGM's] interests throughout this action, as [Federal Defendants] remain[] free to

change [their] strategy during the course of litigation." [20]  *100Reporters*, 307 F.R.D. at 280

(citing *Wildearth Guardians,* 272 F.R.D. at 19–20 (finding inadequate representation when,

---

[20] This conflict is apparent from the Secretary's recent approval of Plaintiffs'
amendments to the Mohegan Compact—which MGM opposed—bringing MGM closer to the
competitive harm discussed above.

"although there are certainly shared concerns, it is not difficult to imagine how the interests of [the intervenor] and the other [federal] defendant[ ] might diverge during the course of litigation" (citation and internal quotation marks omitted))).  Accordingly, though MGM's interests currently overlap with Federal Defendants' interests, the Court holds that MGM has satisfied the inadequate representation requirement.

*        *        *

As explained above, because MGM has shown that it has Article III standing and that it meets the requirements of Rule 24(a), it may intervene by right as a defendant. [21]  However, the Court's inquiry does not end here, for "district courts may impose appropriate conditions or restrictions upon the intervenor's participation in the action."  *Wildearth Guardians*, 272 F.R.D. at 20 (citing *Fund for Animals,* 322 F.3d at 737 n.11).  Plaintiffs and MGM have agreed to certain conditions of intervention, which the Court will adopt: (1) MGM shall not assert cross-claims, counterclaims, or other collateral claims against Plaintiffs or Federal Defendants; (2) MGM shall limit its briefing to issues raised by Plaintiffs' claims; (3) MGM shall not seek to extend briefing deadlines or amend the briefing schedule without the other parties' consent; (4) MGM's memoranda in support of or in opposition to motions shall not exceed 30 pages and its reply memoranda shall not exceed 20 pages;[22] and (5) MGM shall confer with Interior to avoid duplicative arguments.

---

[21] The Tribes also claim that MGM may not intervene because it has failed to comply with Federal Rule 24(c), which requires that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought."  Tribes Intervention Opp'n at 26.  They acknowledge that MGM submitted a proposed answer with its motion, but they claim that its defense on behalf of Federal Defendants "does not comport with the actual facts or law of the case."  *Id.*  Having reviewed MGM's proposed answer, the Court concludes that the pleading is sufficient to discharge MGM's Rule 24(c) obligation.

[22] MGM's provisional briefs comply with this requirement.

Having concluded that MGM may intervene as a defendant, the Court will consider

MGM's provisional briefs timely filed, including its provisional reply brief in support of Federal

Defendants' motion to dismiss (ECF No. 30).  The Court will also deny Plaintiffs' motion to

exclude MGM's provisionally filed status report (ECF No. 44), because as an intervenor-

defendant MGM is entitled to take a position on the litigation's direction.

## V.  FEDERAL DEFENDANTS' MOTION TO DISMISS

The Court next addresses Federal Defendants' motion to dismiss.  As noted, Plaintiffs

assert that the Secretary violated the APA by failing to take nondiscretionary action; approving

the proposed amendments to the Pequot Procedures in accordance with the IGRA's tribal-

compact approval provisions.  *See generally* Compl.  Federal Defendants argue, however, that

under the IGRA and its implementing regulations, the Secretary's approval of secretarial

procedures and procedure amendments is not governed by the same timing requirements

governing the Secretary's approval of tribal-state compacts and compact amendments.  Under

this interpretation of the IGRA, the "mandatory timeframes" that Plaintiffs claim dictated the

Secretary's actions with respect to amendments to the Mohegan Compact do not apply to

amendments to the Pequot Procedures.  Fed. Defs. Mot. Partial Dismissal ("Fed. Defs. Mem.") at

6, ECF No. 18.  According to Federal Defendants, "Plaintiffs have therefore failed to establish

this Court's subject matter jurisdiction over the case and failed to state a claim for which relief

can be granted with regard to [Pequot's] proposed procedures amendment," because Plaintiffs

have not identified a nondiscretionary action that the Secretary unlawfully failed to take.  *Id.*

Plaintiffs, unsurprisingly, read the IGRA very differently.  They claim Defendants'

"hyper-formalistic reading of IGRA and the Part 293 Regulations . . . flies in the face of explicit

and implicit congressional intent, relevant canons of statutory construction, the past conduct of

all parties, including the Defendants themselves, prior legal opinions from the Defendants' own Solicitor, the terms of the Pequot Compact itself, and common sense." Pls. Opp'n Fed. Defs. Mem. ("Pls. Opp'n") at 10, ECF No. 27.[23] Plaintiffs argue that their claims remain valid and properly before the Court, despite Mohegan's stipulation of dismissal.

The Court will first consider the parties' interpretations of the IGRA—and the deference to which the Department's interpretation is entitled—and then determine the proper interpretation's impact on the Court's subject matter jurisdiction and the sufficiency of Plaintiffs' complaint. The Court concludes that Federal Defendants' interpretation of the IGRA is supported by the relevant provisions' plain meaning, and therefore that the Secretary was not required to act in the manner asserted by Plaintiffs. This conclusion dictates that the Court must dismiss this action for failure to state a claim upon which relief may be granted.

## A. IGRA Interpretation

Plaintiffs, Federal Defendants, and MGM all contend that the IGRA dictates a particular result here, but they dispute what that result should be. Federal Defendants and MGM claim that by its plain terms, the IGRA imposes strict deadlines on the Secretary's consideration of tribal-state compacts but not on the Secretary's imposition of procedures and approval of amendments to those procedures. *See generally* Fed. Defs. Mem; MGM Mem. Plaintiffs claim that the

---

[23] In support of their opposition to Federal Defendants' motion to dismiss, Plaintiffs have requested that the Court take judicial notice of certain Federal Register Notices, correspondence from the Department, a news article, and a Connecticut General Assembly Resolution. *See generally* Pls.' Request Judicial Notice, ECF No. 28. The Court grants Plaintiffs' request and takes judicial notice of these documents. *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . cited by volume and page number"); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014) (stating that "judicial notice may be taken of public records and government documents available from reliable sources"); *In re Lorazepam & Clorazepate Antitrust Litig.*, No. 03-1650, 2004 WL 7081446, at *1 n.3 (D.D.C. May 18, 2004) (taking judicial notice of news articles).

IGRA's purpose, statutory canons, and Federal Defendants' own positions dictate that the same deadlines—those imposed under 25 U.S.C. § 2710(d)(8)—should apply to both tribal-state compacts and secretarial procedures, and amendments thereto. *See generally* Pls. Opp'n. The Court concludes that while it need not defer to the Department's IGRA interpretation, it agrees with Federal Defendants and MGM that the IGRA unambiguously does not apply the same approval timing requirements to secretarial procedures as it does to tribal-state compacts.

### 1. Deference Owed to the Department

When analyzing an agency's interpretation of a statute—here, the Department's interpretation of the IGRA—courts must apply the two-step framework announced in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council,* 467 U.S. 837 (1984). Under this framework, the Court begins by asking "whether Congress has directly spoken to the precise question at issue," for if it has, the Court must give effect to its unambiguously expressed intent. *Id*. at 842–43. If the Court determines that the statute is ambiguous, it must evaluate whether the agency's interpretation is reasonable. *Id*. at 842–43. This approach "is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 159 (2000) (citing *Chevron*, 467 U.S. at 844).

Plaintiffs argue that if the Court reaches step two of the *Chevron* framework, Federal Defendants' interpretation should be afforded no deference.[24] *See generally* Pls. Sur-Reply.

---

[24] Claiming that Federal Defendants raised *Chevron* deference for the first time in their reply brief, Plaintiffs filed a motion for permission to submit a sur-reply addressing this issue. *See generally* Pls. Sur-Reply Fed. Defs. Mem. ("Pls. Sur-Reply"), ECF No. 34-1. "The decision to grant or deny leave to file a sur-reply is committed to the sound discretion of the Court," *Lu v. Lezell*, 45 F. Supp. 3d 86, 91 (D.D.C. 2014), and a sur-reply is appropriate "when a party is 'unable to contest matters presented to the court for the first time' in the last scheduled

They contend that deference is inappropriate because (1) the Department's litigation position is not the type of agency statement afforded *Chevron* deference, particularly where the Department has not previously explained its interpretation; (2) the "Indian canon of construction" overcomes any deference to the Department; and (3) the Department's interpretation is not a permissible construction of the IGRA. *Id*. at 2–7. The Court agrees with Plaintiffs' first argument, and it therefore declines to defer to Federal Defendants' interpretation.

"[N]ot every kind of agency interpretation, even of a statute the agency administers, warrants *Chevron* deference." *Miller v. Clinton*, 687 F.3d 1332, 1340 (D.C. Cir. 2012). In *United States v. Mead Corp.,* the Supreme Court held that *Chevron* deference applies only when: (1) "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law" and (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id*., 533 U.S. 218, 226–27 (2001). Whether an agency's reasonable statutory interpretation satisfies *Mead's* second requirement depends on the form and context of that interpretation. *See Miller*, 687 F.3d at 1341. The D.C. Circuit does not, for example, defer to litigation positions contained in agency briefs. *Id*. at 1340; *Village of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011). Nor does it defer to unexplained interpretations. *Miller*, 687 F.3d at 1341–42.

While the Department may have authority to make rules under the IGRA, its interpretation here was not promulgated in the exercise of that authority. Federal Defendants have not identified a single piece of written agency guidance explaining *why* the Department

pleading." *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003) (quoting *Lewis v. Rumsfeld,* 154 F. Supp. 2d 56, 61 (D.D.C. 2001)). The Court agrees with Plaintiffs, and it is not persuaded that Federal Defendants raised *Chevron* deference only in response to Plaintiffs' mention of the doctrine in their opposition brief. The Court therefore grants Plaintiffs' motion (ECF No. 34), and deems their sur-reply filed.

believes the approval procedures governing tribal-state compacts are inapplicable to secretarial procedures, much less guidance subject to notice and comment. As Plaintiffs note, Pls. Sur-Reply at 2, even the Department's letters "return[ing]" the amendments at issue did not explain the Department's reasoning. *See* ECF Nos. 9-8 & 9-16. Rather, Federal Defendants ask the Court to rely upon their briefs in this case and the Department's practice of imposing secretarial procedures after the deadlines established for approving tribal-state compacts. Fed. Defs. Reply Br. ("Fed. Defs. Reply") at 12–13, ECF No. 32. The D.C. Circuit has consistently declined to apply *Chevron* deference to these types of agency interpretations, and the Court declines to do so here. *See Miller*, 687 F.3d at 1340–41.[25]

Because *Chevron* is inapplicable, the Court must "proceed to determine the meaning of the [IGRA] the old-fashioned way: '[it] must decide for [itself] the best reading.'" *Miller*, 687 F.3d at 1342 (quoting *Landmark Legal Found. v. IRS,* 267 F.3d 1132, 1136 (D.C. Cir. 2001)). The Court will address the plain meaning of the IGRA provisions at issue here, when read together, and then discuss Plaintiffs' arguments for why the plain meaning should not control. Federal Defendants are in luck, for even without deference, the Court concludes that their interpretation is the proper reading of the IGRA.

## 2. IGRA's Plain Meaning

The Court begins, as it must, with the text of the IGRA governing the approval of tribal-state compacts and secretarial procedures, and amendments thereto. If the text is plain, the Court must enforce it according to its terms. *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242, 251 (2010). Here, the text dictates Federal Defendants' interpretation.

---

[25] Federal Defendants seem to have recognized this; as Plaintiffs note, their opening brief makes no reference to *Chevron* deference.

Federal Defendants and MGM correctly assert that by the IGRA's text, the timing provisions underlying Plaintiffs' complaint fall under the IGRA subsection governing the approval of tribal-state compacts, but not the IGRA subsection governing the imposition of secretarial procedures. The key provision states that "[i]f the Secretary does not approve or disapprove a *compact described in subparagraph (A)* before the date that is 45 days after the date on which the *compact* is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary. . . ." 25 U.S.C. § 2710(d)(8)(C) (emphasis added). The "compact described in subparagraph (A)" is a "Tribal-State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe." *Id.* § 2710(d)(8)(A). The provision mandating the 45-day approval period makes no mention of secretarial procedures—such as the Pequot Procedures—imposed under § 2710(d)(7).[26]

The Department's regulations follow the same structure. They state that "[t]he Secretary must approve or disapprove a compact or amendment within 45 calendar days after receiving the compact or amendment." 25 C.F.R. § 293.10(a). The "compact [and] amendment" under this provision are defined as an "intergovernmental agreement executed between Tribal and State governments under the [the IGRA]," and any amendment to that agreement. 25 C.F.R. §§ 293.2; 293.3; 293.10. As discussed in greater detail below, secretarial procedures fall outside this definition because they are "prescribed" unilaterally by the Secretary as a last resort when a state

---

[26] As Federal Defendants note, the IGRA itself does not expressly discuss amendments to tribal-state compacts or secretarial procedures, only their establishment and initial approval. *See* Fed. Defs. Mem. at 6–7. This does not introduce ambiguity sufficient to alter the Court's conclusion that the IGRA's deadlines governing the Secretary's approval of tribal-state compacts plainly do not govern the Secretary's approval of amendments to secretarial procedures.

and a tribe fail to reach an agreement.  25 U.S.C. § 2710(d)(7).  And again, the Department's

regulations are silent with respect to approval of, and amendments to, secretarial procedures.[27]

"[W]here Congress includes particular language in one section of a statute but omits it in

another section of the same Act, it is generally presumed that Congress acts intentionally and

purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23

(1983); *see also W. Minn. Mun. Power Agency v. FERC*, 806 F.3d 588, 594–95 (D.C. Cir. 2015).

This is particularly true here, where Congress "painstakingly detail[ed]" the approval processes

for tribal-state compacts and secretarial procedures in two different IGRA subsections, and

included certain procedural requirements in one subsection but not the other subsection.  *Teva

Pharms., Indus., Ltd. v. FDA*, 355 F. Supp. 2d 111, 117–18 (D.D.C. 2004) (holding that where

21 U.S.C. "§ 355(c), regulating NDAs, and § 355(j), regulating ANDAs, painstakingly detail the

approval process for each of the type of drugs," "[t]he Court cannot fathom any reason to apply .

. . a provision clearly addressing only ANDAs, to" NDAs).  Had Congress wished to impose

deadlines on the Secretary's consideration, establishment, and amendment of secretarial

procedures, it could have explicitly done so.

As the Supreme Court has frequently stated:

---

[27] As noted above, the Department has promulgated regulations allowing the Secretary to prescribe secretarial procedures following a state's assertion of sovereign immunity.  These regulations state that "[a]n Indian tribe may ask the Secretary to amend [secretarial procedures] by submitting an amendment proposal to the Secretary," and the Secretary "must review the proposal by following the approval process for initial tribal proposals."  25 C.F.R. § 291.14.  The provisions governing the "approval process for initial tribal proposals" impose certain deadlines on the Secretary, *see id*. § 291.8, but they do not contain a "deemed approval" provision and their deadlines do not mirror those established for the Secretary's approval of tribal-state compacts.  While these regulations do not govern the Pequot Procedures, they provide further evidence that had Congress and the Department wished to impose deadlines on the Secretary's approval of the proposed amendments to the Pequot Procedures, they would have explicitly done so.

> [I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.

*Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54 (1992) (internal quotation marks

omitted) (citing, *inter alia*, *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241–42

(1989); *Rubin v. United States,* 449 U.S. 424, 430 (1981)).  According to the language of the

IGRA and its implementing regulations, secretarial procedures—governed by 25 U.S.C. §

2710(d)(7) and unilaterally imposed by the Secretary—are not subject to the procedural

requirements applicable to tribal-state compacts governed by § 2710(d)(8) and executed by states

and tribes collaboratively.  Accordingly, the Secretary was under no obligation to approve or

disapprove the proposed amendments to the Pequot Procedures within 45 days of their

submission, nor was the Secretary required to consider the amendments approved by law after 45

days and publish that approval in the Federal Register.

### 3. Plaintiffs' Arguments

Plaintiffs do not dispute Federal Defendants' textual reading of the IGRA.  Rather, they

contend that "[a] look at the statutory scheme of [the] IGRA as a whole, as well as both the

explicit and implicit congressional intent underlying the act, shows that Congress never intended

to deprive compacts arrived at through the mediation process of the benefit of the circumscribed

review and approval process under § 2710(d)(8)."  Pls. Opp'n at 12.  Plaintiffs accordingly offer

several arguments for why the plain meaning set forth above is incorrect.  Plaintiffs are correct

that oftentimes the "meaning—or ambiguity—of certain words or phrases may only become

evident when placed in context," and that when deciding whether the language is plain, the Court

must read the words "with a view to their place in the overall statutory scheme." *Brown &*

*Williamson,* 529 U.S. at 132–133 (internal quotation marks omitted); *see also* Pls. Opp'n at 12. However, Plaintiffs' arguments do not overcome the IGRA's plain meaning here.

### a. Congressional Intent

First, Plaintiffs argue that Federal Defendants' position "plainly would frustrate congressional intent" because Congress intended for both tribal-state compacts and secretarial procedures to facilitate tribal gaming equally. Pls. Opp'n at 12–13. In support of this argument, Plaintiffs rely on a 1991 Department Solicitor Opinion relating to the Pequot Procedures. *See* Memorandum from Office of Solicitor to Asst. Secretary, BIA.IA.1102 (the "Opinion") (Apr. 9, 1991), ECF No. 28-5. The Opinion addressed the Nevada Resort Association's claim that gaming activity under the Pequot Procedures must comply with all Connecticut state laws, including restrictions on gaming, because 18 U.S.C. § 1166(c) exempts from state law only gaming "conducted under a Tribal-State compact approved by [the Secretary]," and the Pequot Procedures were not a tribal-state compact. Opinion at 3–4 (citing § 1166(c)). In rejecting that reading, the Department's Solicitor stated that the Association's interpretation would render secretarial procedures meaningless, because Congress intended that tribal-state compacts and secretarial procedures be pieces of a "single, unified and internally consistent mechanism" to facilitate tribal gaming. *Id*. at 7. Subjecting procedures to state laws forbidding gaming, while exempting tribal-state compacts from those same laws, would frustrate Congress's intent to "authorize gaming under compact procedures as well as approved compacts." *Id*. at 7–8.

However, the Opinion did not concern the IGRA's approval provisions at issue here. Nor did it conclude that secretarial procedures and tribal-state compacts should be treated consistently in every manner under the IGRA. Rather, it concluded that, for purposes of a

specific federal statutory provision exempting tribal gaming from state law, adhering to the provision's plain meaning would:

> require a Tribe to pursue negotiations, engage itself and the judiciary in litigation, and pursue each of the first six steps in the dispute resolution process established under Section 2710(d)(7), yet finish with a result equivalent to never having asked for a negotiated compact, never having negotiated, never having brought legal action, and never having a mediator appointed and involved in selection of a compact.

Opinion at 6.[28] As the Secretary stated in a later rulemaking, secretarial procedures, therefore "are properly viewed as a full *substitute* for the compact that would be 'in effect,' if a voluntary agreement had been reached . . . ." 63 Fed. Reg. 3,289, 3,292 (Jan. 22, 1998) (emphasis added). Federal Defendants' argument that secretarial procedures are subject to different approval requirements than tribal-state compacts does not bear on Congress's intent that the two forms be treated equivalently *after* approval.

### b.  Absurdity Principle

Second, Plaintiffs argue that the Court should not adopt the plain meaning of §§ 2710(d)(7) and 2710(d)(8) because doing so would render other IGRA provisions absurd and meaningless. Pls. Opp'n at 16. Courts have a well-established obligation to avoid adopting statutory constructions with absurd results. *See Pub. Citizen v. DOJ,* 491 U.S. 440, 454–55 (1989). This principle dictates that the Court cannot give effect to a statute's literal meaning when doing so would "render[ the] statute nonsensical or superfluous or . . . create[] an outcome so contrary to perceived social values that Congress could not have intended it." *United States v. Cook,* 594 F.3d 883, 891 (D.C. Cir. 2010) (internal quotation marks omitted). However, the

---

[28] Plaintiffs claim that the Solicitor Opinion is entitled to *Chevron* deference because it "provided the basis for a secretarial decision" and it was incorporated into a published Federal Register notice. Pls. Opp'n at 14–15. Because the Court does not read the Opinion as speaking to the interpretation at issue here, it need not determine whether *Chevron* deference is warranted.

D.C. Circuit gives the absurdity principle a narrow domain, insisting that an interpretation cross a "high threshold" of unreasonableness before the Court may conclude that a statute does not mean what it says. *Id.* at 891. "Because [the Court's] role is not to correct the text so that it better serves the statute's purposes, [it] will not ratify an interpretation that abrogates the enacted statutory text absent an extraordinarily convincing justification." *Sierra Club v. EPA,* 294 F.3d 155, 161 (D.C. Cir. 2002) (internal quotation marks and citation omitted).

In appealing to the absurdity principle, Plaintiffs appear to have expanded Federal Defendants' narrow distinction between tribal-state compacts and secretarial procedures— restricted solely to the Secretary's requirements for approving their amendments—to a broad assertion that tribal-state compacts and procedures should never be treated the same. For instance, as discussed above, Plaintiffs note that "if compacts selected by a mediator and approved by the Secretary under § 2710(d)(7)(B)(vii) are not treated as compacts under [the] IGRA, then [18 U.S.C.] § 1166 would require tribal gaming conducted under such compacts to be fully compliant with all state law applicable to non-Indian gaming." Pls. Opp'n at 16. Along the same lines, Plaintiffs state that if procedures were "legally distinct from and lesser than" tribal-state compacts, gaming conducted pursuant to procedures would be illegal under the Johnson Act, 15 U.S.C. § 1175, which forbids the possession or use of "any gambling device" on tribal land except gaming conducted under "a *Tribal-State compact* . . . ." 25 U.S.C. § 2710(d)(6) (emphasis added); *see* Pls. Opp'n at 17. Finally, Plaintiffs posit that if secretarial procedures are not considered to be tribal-state compacts, gaming pursuant to procedures would not be legal under the IGRA itself, which states that gaming on tribal lands is lawful if

"conducted in conformance with a *Tribal-State compact* entered into by the Indian tribe and the State . . . ." § 2710(d)(1) (emphasis added); *see also* Pls. Opp'n at 18.[29]

The Court agrees that a general rule dictating that secretarial procedures are inferior to tribal-state compacts would render much of the IGRA and its relationships to other statutes absurd. However, Federal Defendants do not proffer such an interpretation here. Rather, Federal Defendants simply contend that the provisions addressing the approval or disapproval of tribal-state compacts contained in § 2710(d)(8) do not apply to secretarial procedures imposed under § 2710(d)(7). A conclusion that procedures and tribal-state compacts are subject to different approval processes does not "render[] [the IGRA] nonsensical or superfluous," *Cook,* 594 F.3d at 891, because it does not dictate that approved procedures and tribal-state compacts be treated differently under other provisions of the IGRA.

Unfortunately, many statutes contain "more than a few examples of inartful drafting," *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015), and the Court does not find it illogical that secretarial procedures and tribal-state compacts should be treated the same when to do otherwise would be absurd, and that they should be treated differently when the statute's text dictates that result. Moreover, as MGM notes, MGM Mem. at 13, "identical language may convey varying content . . . sometimes even in different provisions of the same statute." *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015).

---

[29] MGM notes that the IGRA subsection specific to the imposition of secretarial procedures, § 2710(d)(7)(B)(vii)(II), states that the Secretary shall prescribe procedures "under which class III gaming may be conducted on the Indian lands . . . ." MGM's Reply Supp. Fed. Defs. Mem. ("MGM Reply") at 12, ECF No. 30-2. Arguably, therefore, § 2710(d)(1) is not necessary to legalize procedures-based gaming under the IGRA, because § 2710(d)(7) explicitly authorizes it under federal law.

Federal Defendants' interpretation is further borne out by the IGRA's legislative history. *See* Fed. Defs. Mem. at 7. In 2004, Senators Ben Campbell and Daniel Inouye of the Committee on Indian Affairs proposed an amendment to 25 U.S.C. § 2710(d)(7)(B)(vii) that would have required the Secretary to impose procedures within 180 days of a mediator's submission. *See* S. Rep. No. 108-380, at 14 (2004).[30] A Department official, George Skibine, testified that the amendment, while preventing the Secretary from indefinitely stalling the imposition of procedures, would provide sufficient time for the Secretary "to carefully examine difficult questions of state and federal law that are usually involved in this process." Statement of George Skibine, Acting Deputy Assistant Sec'y, Policy & Econ. Dev. on S. 1529 Before the S. Comm. on Indian Affairs at 2 (2004).[31] While not dispositive, this legislative history reflects the principle that "Congress knows well how to [impose deadlines for agency action] *only* under specified provisions or circumstances." *Pub. Citizen, Inc v. Rubber Mfrs. Ass'n,* 533 F.3d 810, 817 (D.C. Cir. 2008). If Congress had intended the timing requirements of § 2710(d)(8) to govern the approval of secretarial procedures, the proposed amendment explicitly adding timing requirements for procedures would have been superfluous. *See U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 509 (D.C. Cir. 2004) (describing the "rule against superfluities . . . which bars a reading that would have one of several distinct clauses do all the necessary work.").[32]

---

[30] Again, at the motion to dismiss stage, the Court may consider documents in the public record of which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). Accordingly, the Court takes judicial notice of this Senate Report and George Skibine's statement below.

[31] Available at www.bia.gov/sites/bia.gov/files/assets/as-ia/pdf/idc008176.pdf.

[32] While the proposed amendment did not pass, the Court finds its proposal by members of the Committee on Indian Affairs—who were presumably well-versed in the IGRA—relevant.

### c. Practical Considerations

Third, Plaintiffs argue that "[g]iven the strict statutory and regulatory limitations on the Defendants' discretion with respect to the review and approval of compacts and amendments, there is no reason to assume that Congress wanted to vest them with unfettered discretion to delay, reject, or simply ignore [procedures]." Pls. Opp'n at 20. However, Federal Defendants and MGM persuasively offer practical considerations for why Congress would want to do just that. The Secretary's divergent responsibilities with respect to tribal-state compacts and secretarial procedures may justify divergent approval processes.

As explained above, § 2710(d)(7)'s remedial provisions mandate several steps designed to facilitate agreement between a state and a tribe on the terms of a tribal-state compact. However, if the state ultimately refuses to or fails to reach an agreement with the tribe, the Secretary "in consultation with the Indian tribe . . . shall *prescribe* . . . procedures . . . *consistent with* the proposed compact selected by the mediator . . . the provisions of [the IGRA], and the relevant" state laws. § 2710(d)(7)(B)(vii) (emphasis added). In other words, the Secretary is responsible for independently considering the proposed compact, state law, and the IGRA, and drafting procedures *consistent with* previous submissions.

Therefore, when establishing secretarial procedures, the Secretary's responsibilities go beyond merely approving terms hashed out by a state and a tribe. Plaintiffs correctly note that the timing provisions in § 2710(d)(8) "ensure that tribes and states are not stymied by bureaucratic delays . . . after long and arduous compact negotiations" resulting in an agreement, Pls. Opp'n at 20, but the Secretary imposes procedures when there has been no such agreement. It would have been reasonable for Congress to impose strict deadlines on the Secretary's review of a completed tribal-state compact, while providing the Secretary with more time and discretion

to draft procedures consistent with state law, the IGRA, existing proposals, and the Secretary's obligations to the tribes. *Cf. Pub. Citizen*, 533 F.3d at 817 (adopting a reasonable explanation of a provision's purpose despite not being able to "know for certain what purpose Congress had in mind"). Plaintiffs have identified no legislative history or other evidence to the contrary, and to the "extent that [Plaintiffs'] argument [is] about public policy, it is addressed to the wrong audience." *Id*. at 820.

### d. Indian Canon of Construction

In a final attempt to overcome the IGRA's plain meaning, Plaintiffs appeal to the Indian canon of construction. This canon requires that statutes must be "construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444–45 (D.C. Cir. 1988) (citation omitted). According to Plaintiffs, this canon dictates that the IGRA and its implementing regulations "must be interpreted to the benefit of the Pequot Tribe, with any ambiguities resolved in its favor." Pls. Opp'n at 25. "This canon, however, has force only where a statute is ambiguous," and as discussed above the IGRA's plain meaning is not ambiguous with respect to the approval requirements for tribal-state compacts, secretarial procedures, and their amendments. *El Paso Nat. Gas Co. v. United States*, 632 F.3d 1272, 1278 (D.C. Cir. 2011) (citation omitted). Additionally, the canon "does not apply for the benefit of one tribe if its application would adversely affect the interests of another tribe," and it is not clear that applying § 2710(d)(8)'s tribal-state compact approval deadlines to secretarial procedures would benefit tribes generally. *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 75 F. Supp. 3d 387, 396 (D.D.C. 2014) (citing *Confederated Tribes of Chehalis Indian Reservation v. Washington,* 96 F.3d 334, 340 (9th Cir. 1996)), *aff'd*, 830 F.3d 552 (D.C. Cir. 2016). Applying those tribal-state compact provisions to procedures may dictate a favorable

result for Pequot here, but providing the Secretary with more than 45 days to consider state law and tribes' wishes when imposing and amending secretarial procedures may facilitate more collaboration between the Secretary and tribes and is likely to result in more well-considered procedures, while rushing the process may work to tribes' detriment. *See Forest Cty. Potawatomi Cmty. v. United States ("Forest County II")*, No. 15-0105, 2018 WL 4308570, at *6 (D.D.C. Sept. 10, 2018) ("The Court declines to apply the Indian law canon where the interests of all tribes are not aligned.") (citation omitted).

### e. Existence of a De Facto Compact

Failing to convince the Court that the Pequot Procedures are subject to the same procedural requirements as the Mohegan Compact, Plaintiffs argue that Pequot and the state have a de-facto tribal-state compact, governed by 25 U.S.C. § 2710(d)(8)(A)'s approval requirements, based on their compliance with the Pequot Procedures. The IGRA's text and the Department's regulations belie this argument, as does the state's own previous positions.

Plaintiffs' argument relies on the Department's regulations and the operation of the Pequot Procedures. Plaintiffs note that the Department's regulations define a compact as "an intergovernmental agreement executed between Tribal and State governments under [the IGRA] that establishes between the parties the terms and conditions for the operation and regulation of the tribe's Class III gaming activities." 25 C.F.R. § 293.2. They argue that the Pequot Procedures fall within that definition because they establish terms and conditions for the operation of Pequot's gaming in Connecticut. Pls. Opp'n at 22–23. They further argue that the state and Pequot "executed" the implied compact by fulfilling their responsibilities established in the procedures over "an extended period of time." *Id*. at 23 (citing Black's Law Dictionary (10th ed. 2014) (providing that the primary definition of the verb "execute" is "[t]o perform or

48

complete a contract or duty" (internal punctuation omitted)). However, while the Pequot Procedures satisfy one compact criterium identified in § 293.2—they establish terms and conditions for gaming—Plaintiffs fail to show that the procedures satisfy the other compact criteria—they represent an "intergovernmental agreement executed between" Pequot and the state under the IGRA.

First, Plaintiffs fail to show that the Pequot Procedures constitute an intergovernmental agreement between Pequot and the state. In fact, procedures are imposed under 25 U.S.C. § 2710(d)(7) specifically when a state and a tribe *cannot* agree on terms and conditions. *Id*. § 2710(d)(7)(B)(vii) (directing the Secretary to impose procedures "[i]f the State does not consent" to a proposed compact); *see also* Pls. Opp'n at 12–13 (stating that § 2710(d)(7) allows tribes to enjoy the benefits of a compact "without . . . state cooperation"). The fact that the state and Pequot have now agreed to amend the procedures does not remedy their previous lack of agreement, which rendered the Pequot Procedures necessary in the first place.

Second, Plaintiffs fail to show that the Pequot Procedures were "executed" as a tribal-state compact under the IGRA. Plaintiffs' argument that a tribal-state compact may be executed through performance is contradicted by the IGRA and the Department's regulations. A state and a tribe cannot perform under a tribal-state compact until that compact takes effect. A compact takes effect "*only when* notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register." 25 U.S.C. § 2710(d)(3)(B) (emphasis added); 25 C.F.R. § 293.15(a). And as MGM notes, MGM Reply at 16–17, the Secretary will not consider a proposed tribal-state compact for approval until it has been "executed." *Id*. § 293.8(a). It is therefore nonsensical to suggest that a tribal-state compact may be executed through performance, when that compact must be executed before performance is possible. The IGRA's

legislative history referenced by MGM supports this point.[33] *See* 73 Fed. Reg. 74,004, 74,006 (Dec. 5, 2008) (responding to a request that the Department require a tribal-state compact to be "signed" before the Secretary may approve it, stating that "existing language in the rule requiring that the compact be 'executed' by both parties addresses this comment").

Moreover, the state—in Attorney General opinions and federal litigation positions—has previously explicitly argued that the Pequot Procedures are *not* a tribal-state compact. *See* Defs.' Reply Pls. Mot. Dismiss, *Tassone v. Foxwoods Resort Casino*, No. 11-1718, 2012 WL 12548954 (D. Conn. filed Mar. 23, 2012); 2008 Att'y Gen. Op. No. 2008-005, 2008 WL 714081, at *3 n.5 (Conn. A.G. Mar. 13, 2008) (noting that "[t]he document that governs the Mashantucket Pequot Tribe's gaming operations is not technically a 'compact' because it was imposed on the State by the Secretary of the Interior under the IGRA") (citations omitted). The Court agrees with this position.

Plaintiffs also claim that "Defendants' own conduct" demonstrates the existence of a tribal-state compact. Pls. Opp'n at 23. First, Plaintiffs note that the Department published the Pequot Procedures in the Federal Register in the same fashion that the Department publishes tribal-state compacts. *Id*. at 23. Second, Plaintiffs note that the Department cited the 25 U.S.C. § 2710(d)(8) procedures "in the course of providing technical assistance to the Tribes as they negotiated the subject amendments with the State." Pls. Opp'n at 24. Third, Plaintiffs note that the Pequot Procedures can be amended only with the Secretary's approval and publication in

---

[33] Accordingly, despite Plaintiffs' suggestions to the contrary, Pls. Opp'n at 23 n.10, there is no ambiguity regarding whether a tribal-state compact can be executed by performance. It is therefore inappropriate for the Court to look to the Indian canons of construction for guidance on this question. *See El Paso Nat. Gas*, 632 F.3d at 1278.

accordance with § 2710(d)(3)(B).[34]  Pequot Procedures at 49–50.  However, Plaintiffs have not

explained how the Department's decision to treat tribal-state compacts and secretarial procedures

consistently in certain respects mandates that the approval timing requirements governing tribal-

state compacts also govern procedures.

As the D.C. Circuit has noted, an agency may adopt "additional procedures" not required

by statute, but the Court is "without authority to impose such procedural requirements."  *Nat.*

*Res. Def. Council, Inc. v. Nuclear Regulatory Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000).

That the Secretary imposed requirements in the Pequot Procedures not required by the IGRA

does not mean that the Court may hold the Department to other additional requirements.

Moreover, it is unclear why § 2710(d)(3)(B) is, as Plaintiffs claim, "inextricably related" to the

approval provisions contained in § 2710(d)(8), when § 2710(d)(3)(B) does not reference the

approval provisions.[35]  It was reasonable for the Secretary to retain oversight of amendments to

the Pequot Procedures, while reserving the right to take time evaluating those amendments.  And

Plaintiffs' cherry-picked language from the Department's technical assistance letters that "the

_____

[34] Again, § 2710(d)(3)(B) states that "[a]ny State and any Indian tribe may enter into a
Tribal-State compact governing gaming activities on the Indian lands of the Indian tribe, but
such compact shall take effect only when notice of approval by the Secretary of such compact
has been published by the Secretary in the Federal Register."

[35] Furthermore, the Pequot Procedures do contain "deemed approved" provisions, but
those provisions do not apply to proposed amendments to the Procedures.  *See* Pequot
Procedures § 9(a) (stating that Pequot "shall notify the State gaming agency of any revision of
the standards of operation [of lottery gaming]" and that the state's approval of the revision "shall
be deemed granted unless disapproved within sixty days of submission of the revised
standards").  Again, this indicates that had the Secretary wished to impose deadlines on the
approval of amendments to the Pequot Procedures, the Secretary could have expressly done so.

Tribes and State have long-relied upon the Compacts," ECF Nos. 9-5 at 2 & 9-13 at 2, similarly does not convince the Court to deviate from the IGRA's plain meaning.[36]

### f. Judicial Estoppel

Finally, Plaintiffs argue that the doctrine of judicial estoppel should bar Federal Defendants' arguments, regardless of their merits. Judicial estoppel provides that a party that successfully asserts a position in litigation "may not thereafter, simply because his interests have changed, assume a contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks and citation omitted); 18 Moore's Federal Practice § 134.30, at 134–62 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.").

> [S]everal factors typically inform the decision whether to apply the doctrine . . . [including whether] a party's later position [is] clearly inconsistent with its earlier position[,] . . . whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled, . . . [and] whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

---

[36] In their sur-reply, Plaintiffs argue that even if the Pequot Procedures were initially not subject to the approval timing requirements governing tribal-state compacts, the proposed amendments to those procedures should be considered the equivalent of a tribal-state compact because they were developed through tribal-state cooperation. Plaintiffs' Sur-Reply at 5–7 ("While Plaintiffs would disagree that the Defendants can take as much time as they would like in prescribing amendments to procedures than [sic] in reviewing and approving compact amendments, that is not the issue before the Court."). However, Plaintiffs have not identified any statutory provision or case law suggesting that secretarial procedures may be converted into a tribal-state compact through mere tribal-state cooperation. Regardless, the Court declines to entertain an argument raised for the first time in a sur-reply. *See Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51 (D.D.C. 2015) ("[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief.") (citing *Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 139 n.4 (D.D.C. 2011)); *see also McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only unfair . . ., but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered.") (citation omitted)).

*Rogler v. Gallin*, 402 Fed. Appx. 530, 530 (D.C. Cir. 2010) (quoting *New Hampshire*, 532 U.S. at 750–51) (internal quotation marks omitted). Because the "purpose [of judicial estoppel] is to protect the integrity of the judicial process . . . [and] to prevent improper use of judicial machinery . . . [it may be] invoked by a court at its discretion." *New Hampshire*, 532 U.S. at 749–50 (quotation marks and citations omitted).

Plaintiffs' judicial estoppel claim relies on Federal Defendants' briefing in *Stand Up for Cal.! v. U.S. Dep't of the Interior*, No. 16-2681, 2018 WL 3473975 (E.D. Cal. July 18, 2018). In that case, the plaintiffs claimed that certain secretarial procedures governing a tribe's gaming in California violated the Johnson Act because the IGRA only exempts from that Act "a *Tribal-State compact*." 25 U.S.C. § 2710(d)(6) (emphasis added). The plaintiffs argued that secretarial procedures are not a tribal-state compact under the IGRA, and are therefore not exempt from the Johnson Act's prohibition of the use of gambling devices on tribal land. 15 U.S.C. § 1175. In response, Federal Defendants successfully argued that such an interpretation would render the IGRA absurd and its remedial provisions inoperative, and that "[r]eading IGRA as a whole . . . makes clear that Secretarial Procedures are designed to operate as a complete substitute to existence of an effective Tribal-State compact." *Stand Up*, 2018 WL 3473975, at *6–8.

Plaintiffs argue that Federal Defendants' "position here is wholly irreconcilable with the one that they just took and the Court adopted in the *Stand Up* case," and that Federal Defendants should be estopped from taking both positions. Pls. Suppl. Br. Supp. Mot. Summ. J. ("Pls. Suppl. Br.") at 8, ECF No. 54. Federal Defendants respond, among other arguments, that they have not taken "clearly inconsistent" positions, and that Plaintiffs have mischaracterized their position in this case. Fed. Defs. Resp. Pls. Suppl. Br. at 5–8, ECF No. 55. Having reviewed the

*Stand Up* briefing, the Court agrees with Federal Defendants and declines to apply judicial estoppel.

While Federal Defendants have chosen different sides in this action and *Stand Up*—here, opposed to the state (Connecticut) and the Tribes (Pequot and Mohegan), and there, in support of the state (California) and the tribe (the North Fork Rancheria of Mono Indians)—Federal Defendants' positions are not clearly inconsistent. As noted above, Plaintiffs attempt to frame Federal Defendants' argument broadly, as asserting that secretarial procedures are "legally distinct from and lesser than" a tribal-state compact, Pls. Opp'n at 17, or that "Secretarial Procedures are *not* a full and complete substitute for a tribal-state compact" with respect to the IGRA generally, Pls. Suppl. Br. at 7–8. Such an argument would seem to be inconsistent with the position taken in *Stand Up*, in which Federal Defendants argued that secretarial procedures are "designed to operate as a complete substitute to" a tribal-state compact. *Stand Up*, 2018 WL 3473975, at *6.

Federal Defendants' argument before this Court, however, is narrower. They simply assert that by their plain meaning, the IGRA's timing provisions governing the Secretary's approval of a tribal-state compact and its amendments do not apply to the Secretary's imposition of secretarial procedures and their amendments. Fed. Defs. Mem. at 6–7. Federal Defendants' argument that tribal-state compacts and secretarial procedures are approved differently does not clearly contradict their argument that the two forms are functionally equivalent, once approved, in authorizing gaming on tribal land.

The D.C. Circuit has held in the context of judicial estoppel that "[d]oubts about inconsistency often should be resolved by assuming there is no disabling inconsistency, so that the second matter may be resolved on the merits." *Comcast Corp. v. FCC*, 600 F.3d 642, 647

(D.C. Cir. 2010) (quoting 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477, at 594 (2d ed. 2002)).  Plaintiffs have demonstrated at most that Federal Defendants have taken strategic positions that are in tension, but not that their arguments made in *Stand Up* are clearly inconsistent with their arguments made here.  Accordingly, the Court elects to resolve Federal Defendants' motion on its merits.

*          *          *

In sum, 25 U.S.C. §§ 2710(d)(7) and 2710(d)(8), read together, dictate that the Secretary must disapprove tribal-state compacts and compact amendments within a certain period of their submission or else deem them approved, but that those timing requirements do not apply to secretarial procedures and amendments to those procedures.  "Reliance on context and structure in statutory interpretation is a 'subtle business, calling for great wariness lest what professes to be mere rendering becomes creation and attempted interpretation of legislation becomes legislation itself.'"  *King*, 135 S. Ct. at 2495–96 (citing *Palmer v. Massachusetts,* 308 U.S. 79, 83 (1939)).  Applying this principle, the plain meaning of 25 U.S.C. §§ 2710(d)(7) and 2710(d)(8) is sufficiently clear that the Court declines to deviate from that meaning based on Plaintiffs' contextual arguments.  Accordingly, the Court concludes that the Secretary was not required to act on Plaintiffs' proposed amendments to the Pequot Procedures in the manner asserted by Plaintiffs.

### B.  Failure to State a Claim

Because the Court concludes that the IGRA does not require the Secretary to take the steps asserted by Plaintiffs, the Court must consider Defendants' argument that Plaintiffs have failed to state claims upon which relief may be granted.  As noted above, "a claim under [5 U.S.C.] § 706(1) can proceed only where a plaintiff asserts that an agency failed to take

a *discrete* agency action that it is *required to take*." *SUWA,* 542 U.S. at 64. Thus, a plaintiff must allege that the defendant had a duty to perform a nondiscretionary act. *See id.* If no such duty exists, the Plaintiff has "not state[d] a claim upon which relief can be granted." *Ctr. for Biological Diversity*, 260 F. Supp. 3d at 24 (citing *SUWA*, 542 U.S. at 63–64 (noting that courts cannot order actions pursuant to § 706(1) that are not otherwise compelled by law)).

Applying these principles, Plaintiffs' allegations regarding their proposed amendments to the Pequot Procedures fail to state a claim because they do not identify a nondiscretionary duty imposed by the IGRA or its implementing regulations. In Count I, Plaintiffs claim that because the Secretary failed to either approve or disapprove the proposed amendments to the Pequot Procedures within 45 days of their submission, "pursuant to 25 U.S.C. § 2710(d)(8)(C) and 25 C.F.R. § 293.13, the . . . amendments are deemed approved" and the Secretary's failure to deem them approved is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2). *See* Compl. ¶¶ 45–47. In Count II, Plaintiffs claim that because the "amendments were deemed approved by operation of law . . . Defendants had a clear mandatory duty to Plaintiffs to publish notices of approval . . . within 90 days after receipt of the requests for approval" pursuant to 25 U.S.C. § 2710(d)(8)(D) and 25 C.F.R. § 293.15(b), and the Secretary's failure to publish the notices is agency action unlawfully withheld in violation of the APA, 5 U.S.C. § 706(1). Compl. ¶¶ 55–57. However, as discussed above, the IGRA statutory provisions and regulations cited by Plaintiffs do not require the Secretary to act on the proposed amendments to the Pequot Procedures within 45 days of their submission.

While Count I contends that the Secretary acted "not in accordance with law" in violation of APA § 706(2), the Count's core allegation is that the Secretary unlawfully withheld action— deeming the proposed amendments to the Pequot Procedures approved—thus the claim is more

properly framed as a violation of § 706(1).  Regardless, Plaintiffs "would have fared no better if

they had characterized the agency's alleged [failure to deem the proposed amendments to the

Pequot Procedures approved] in terms of 'agency action unlawfully withheld' under § 706(1),

rather than agency action 'not in accordance with law' under § 706(2)."  *SUWA*, 542 U.S. at 65.

This is because the Secretary had no duty to deem the amendments approved after 45 days, nor

did the Secretary have a duty to publish that approval in the Federal Register.  In certain

circumstances, the Court may "compel unreasonably delayed agency action."  *Hamandi v.

Chertoff*, 550 F. Supp. 2d 46, 50 (D.D.C. 2008).[37]  Here, however, Plaintiffs do not contend that

the Secretary unreasonably delayed ruling on the proposed amendments to the Pequot

Procedures, but rather that the Secretary was required to "perform . . . nondiscretionary act[s] by

ascertainable deadlines and has failed to do so."  *Fort Sill Apache Tribe v. Nat. Indian Gaming

Comm'n*, 103 F. Supp. 3d 113, 119 (D.D.C. 2015).  Because the IGRA and its implementing

regulations do not impose those deadlines on the Secretary, the Court dismisses Plaintiffs' claims

for failing to state a claim upon which relief may be granted.[38]  *See SUWA*, 542 U.S. at 63–65.[39]

---

[37] Plaintiffs have not raised the question of whether the Secretary can *indefinitely* delay
approving or denying the proposed amendments to the Pequot Procedures, and the Court does
not rule on that question here.

[38] For these same reasons, Plaintiffs' request for mandamus relief fails.  Mandamus relief
is available only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty
to act; and (3) there is no other adequate remedy available to the plaintiff." *In re Medicare
Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) (citations omitted). The act to be
compelled must be nondiscretionary.  *Pittston Coal Grp. v. Sebben,* 488 U.S. 105, 121 (1988).
As explained above, Plaintiffs have failed to show that the Secretary has a clear,
nondiscretionary duty to act within a specific timeframe on the proposed amendments to the
Pequot Procedures.

[39] Federal Defendants' also make the conclusory argument that the state lacks standing to
assert claims regarding the Pequot Procedures because it is not a "party" to those procedures.
Fed. Defs. Mem. at 10.  However, the state has economic and sovereign interests in the Pequot
Procedures and their proposed amendments, which require the state's legislative approval and

## VI.  CONCLUSION

For the forgoing reasons, the Court hereby **ORDERS**:

1.  MGM's Motion to Intervene (ECF No. 11) is **GRANTED**.

2.  MGM's Motion for Leave to File Reply Brief (ECF No. 30) is **GRANTED**.

3.  Federal Defendants' Motion to Dismiss (ECF No. 18) is **GRANTED**.

4.  Federal Defendants' Motion for Relief from Local Civil Rule 7(n) (ECF No. 49) is
    **GRANTED**.

5.  Plaintiffs' Motion to Take Judicial Notice (ECF No. 28) is **GRANTED**.

6.  Plaintiffs' Motion for Leave to File Sur-Reply Brief (ECF No. 34) is **GRANTED**.

7.  Plaintiffs' Motion for Briefing Schedule Amendment (ECF No. 31) is **DENIED**.

8.  Plaintiffs' Motion to Exclude MGM's Provisional Status Report (ECF No. 44) is
    **DENIED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously

issued.


Dated:  September 29, 2018                                RUDOLPH CONTRERAS
                                                          United States District Judge

---

which impose certain rights and conditions upon the state.  The Court's determination here will
impact those interests.  The state accordingly has standing to challenge the Secretary's decision.