# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| STATE OF CONNECTICUT and | : | | |
| MASHANTUCKET PEQUOT TRIBE | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 17-2564 (RC) |
| | : | | |
| v. | : | Re Document No.: | 60 |
| | : | | |
| U.S. DEPARTMENT OF THE INTERIOR | : | | |
| and RYAN ZINKE, *Secretary of the Interior* | : | | |
| | : | | |
| Defendants, | : | | |
| | : | | |
| and | : | | |
| | : | | |
| MGM RESORTS GLOBAL | : | | |
| DEVELOPMENT, LLC, | : | | |
| | : | | |
| Defendant-Intervenor. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART PLAINTIFFS' MOTION TO AMEND COMPLAINT

## I. INTRODUCTION

Before this Court is the latest volley in a contentious, long-running battle over a stalled casino project in East Windsor, Connecticut. The state of Connecticut (the "State") and the Mashantucket Pequot Tribe claim that the United States Secretary of the Interior has unlawfully declined to approve an agreement that would allow them to begin constructing the casino. Defendants—the Secretary, the Department of the Interior, and MGM Resorts Global Development, LLC—argue that the Secretary has violated no law. Having failed to convince this Court of their first theory of the case, Plaintiffs—the State and the Pequot—seek to amend their complaint and take a second bite at the apple. While Plaintiffs' motion appears to be the

product of tactical timing more than newly-discovered information or legal theories, allowing the case to proceed would not unduly prejudice Defendants. And while one of Plaintiffs' three proposed claims would not survive a motion to dismiss, the Court cannot say that amendment would be futile as to the other two claims. Thus, for the reasons stated below, the Court will allow Plaintiffs to amend their complaint in certain respects.

## II. BACKGROUND[1]

### A. The Indian Gaming Regulatory Act

The Indian Gaming Regulatory Act ("IGRA") governs Class III casino gaming—blackjack, roulette, slot machines, and other casino games—on tribal land. 25 U.S.C. §§ 2701 et seq.; 25 C.F.R. § 502.4; *Amador Cty. v. Salazar*, 640 F.3d 373, 376 (D.C. Cir. 2011). It mandates that a tribe must obtain authorization from a state before conducting Class III gaming on land within that state's borders. 25 U.S.C. § 2710(d)(1)(C). That authorization may be obtained in one of two ways: (1) negotiating a tribal-state compact with the state, *see id*. § 2710(d)(3)(A); or (2) asking the Secretary to impose secretarial procedures, *see id*. § 2710(d)(7)(B).

A tribal-state compact is "an intergovernmental agreement executed between Tribal and State governments under the [IGRA] that establishes . . . the terms and conditions for the operation and regulation of the tribe's Class III gaming activities." 25 C.F.R. § 293.2. If the Secretary does not explicitly approve or disapprove a tribal-state compact within 45 days after the Office of Indian Gaming receives it,[2] the compact shall be automatically approved "to the

---

[1] The Court's recent Memorandum Opinion in this action contains additional background detail. *See Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 289–94 (D.D.C. 2018).

[2] The Office of Indian Gaming is housed within the Department, and its "duties and responsibilities include the administrative review and analysis of the statutory and regulatory

extent the compact is consistent with" the IGRA. 25 U.S.C. § 2710(d)(8)(A)–(C); 25 C.F.R. §§ 293.10–12. The Secretary may disapprove a compact for one of three reasons: (1) it violates the IGRA, (2) it violates any other provision of Federal law that does not relate to jurisdiction over gaming on tribal land, or (3) it violates the United States' trust obligations to Native Americans. 25 U.S.C. § 2710(d)(8)(B); 25 C.F.R. § 293.14. Once a compact is approved, the Secretary must publish that approval in the Federal Register within 90 days from the date of receipt. 25 U.S.C. § 2710(d)(8)(D); 25 C.F.R. § 293.15(b). The compact becomes effective when its approval is published. 25 U.S.C. § 2710(d)(3)(B); 25 C.F.R. § 293.15(a). The Department's regulations apply these same procedural and substantive requirements to compact amendments. *See* 25 C.F.R. §§ 293.4, 293.10.

Secretarial procedures govern class III tribal gaming when a tribe and a state cannot reach good faith agreement on a compact. 25 U.S.C. § 2710(d)(7)(B)(vii)(II). These procedures result from a series of forced negotiations between the tribe and the state, including mediation. *See id*. § 2710(d)(7)(A), (B). If the tribe and the state ultimately cannot agree on a compact, "the Secretary shall prescribe, in consultation with the Indian tribe, procedures" for Class III gaming activities "which are consistent with the proposed compact selected by the mediator . . . the provisions of [the IGRA], and the relevant provisions of the laws of the [s]tate." *Id*. § 2710(d)(7)(B)(vii)(I). The Department has not issued regulations governing the secretarial procedures or procedure amendments at issue in this action.[3]

_____

requirements of IGRA and related statutes, policy development, and technical assistance to tribal and state stakeholders." Office of Indian Gaming, Overview, https://www.bia.gov/as-ia/oig.

[3] The Department has promulgated regulations allowing the Secretary to prescribe secretarial procedures when a state raises an Eleventh Amendment sovereign immunity defense to a tribe's lawsuit alleging that the state did not negotiate in good faith. *See* 25 C.F.R. § 291.1. Those regulations do not apply here because the State did not assert an Eleventh Amendment

## B. Relevant Facts and Procedural History

In 1989, the Pequot sought to open a casino in Connecticut. *See Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1026 (2d Cir. 1990), *cert. denied*, 499 U.S. 975 (1991). However, the Pequot and the State could not agree on a tribal-state compact to govern the Pequot's gambling activities. *Id.* at 1027. The Pequot accordingly availed themselves of the IGRA's secretarial procedures mechanism, and in 1991 the Secretary imposed procedures (the "Pequot Procedures") on the Pequot and the State. *See* Compl. ¶ 25, ECF No. 1; Notice of Final Mashantucket Pequot Gaming Procedures, 56 Fed. Reg. 24,996 (May 31, 1991). The Pequot's casino has operated under these procedures ever since. In 1994 the State and another tribe, the Mohegan Tribe of Indians of Connecticut (the "Mohegan") (together with the Pequot, the "Tribes"), executed a tribal-state compact (the "Mohegan Compact") allowing the Mohegan to operate their own casino within the State. *See* Compl. ¶ 24.[4]

In return for the State allowing the Tribes to operate casinos, the Pequot Procedures and Mohegan Compact Memoranda of Understanding mandate that the State receive a percentage of the Tribes' gross operating revenues from certain gambling activities. *See generally* Pequot Procedures MOU; Mohegan Compact MOU. They also mandate that if the State permits "any

_____

defense to the Pequot's lawsuit leading to the Pequot Procedures. *See Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1032 (2d Cir. 1990), *cert. denied*, 499 U.S. 975 (1991); *see also* Opportunity to Comment on Pequot Procedures, 56 Fed. Reg. 15,746 (Apr. 17, 1991).

[4] The Pequot Procedures and the Mohegan Compact, along with their Memoranda of Understanding ("MOU"), are available at http://www.portal.ct.gov/DCP/Gaming-Division/Gaming/Tribal-State-Compacts-and-Agreements (the "Pequot Procedures," "Pequot MOU," "Mohegan Compact," and "Mohegan MOU"). The Court may take judicial notice of these documents as public records incorporated by reference in the complaint and the proposed amended complaint. *See* Fed R. Civ. P. 12(b)(6); *Felder v. Johanns*, 595 F. Supp. 2d 46, 58–59 (D.D.C. 2009) (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993)); Compl. ¶¶ 24–25, 27; First Am. Compl. ("FAC") ¶¶ 3, 21–25, ECF No. 60-2.

other person" to engage in those activities, the State is no longer entitled to its royalty payments (the "exclusivity clauses"). *See id.* By their terms both the Pequot Procedures and the Mohegan Compact may be amended only by written agreement of the Tribes and the State, and the amendments do not become effective until the Secretary approves them and publishes notice of that approval in the Federal Register in accordance with 25 U.S.C. § 2710(d)(3)(B).[5] *See* Pequot Procedures § 17; Mohegan Compact § 17.

In 2015, the Tribes agreed to form a joint venture, MMCT Venture LLC ("MMCT"), to build and operate an off-reservation, commercial casino in East Windsor, Connecticut.[6] Decl. of Uri Clinton ("Clinton Decl.") ¶¶ 17–19, ECF No. 11-2; *see also* MMCT's Articles of Organization, Mem. Supp. MGM's Mot. Leave Intervene Ex. A, ECF No. 11-3. The proposed East Windsor casino project threatened MGM's plans in the region. MGM was in the midst of constructing a casino in Springfield, Massachusetts, a mere twelve miles north of East Windsor. *See* Pls.' Opp'n to Defs.' Partial Mot. to Dismiss at 9, ECF No. 27; Clinton Decl. ¶¶ 13, 17, 20.[7] MGM also planned to pursue a casino project in Bridgeport, Connecticut. *See* Clinton Decl. ¶¶ 5, 8. It thus lobbied against legislative approval of the Tribes' casino, arguing that Connecticut should implement a competitive selection process for the right to operate the State's first commercial casino. *Id.* ¶ 6. Those efforts failed, and the Tribes secured their casino project's

---

[5] This provision states that "[a]ny [s]tate and any Indian tribe may enter into a [t]ribal-[s]tate compact governing gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register." 25 U.S.C. § 2710(d)(3)(B).

[6] The Court will refer to casinos on tribal land as "tribal casinos," and casinos on state land as "commercial casinos."

[7] That casino opened in 2018. *Id.* ¶¶ 13–16.

conditional approval in 2017 through the passage of Public Act 17-89.[8]  2017 Conn. Acts 17-89

(Reg. Sess.).  This setback notwithstanding, MGM continued to push for a Bridgeport casino.

*See* Clinton Decl. ¶¶ 8–10.

Public Act 17-89 states that MMCT "is authorized to conduct authorized games at a

casino . . . at 171 Bridge Street, East Windsor."  2017 Conn. Acts 17-89 § 14(b) (Reg. Sess.).  Its

passage did not, however, remove all obstacles from the Tribes' path to operating Connecticut's

first commercial casino.  Rather, it provides that its "authorization shall not be effective unless":

> (1) the Tribes and the State's governor execute "amendments to" the Pequot
> Procedures and the Mohegan Compact, and their memoranda of understanding,
> creating a special exemption for MMCT such that "authorization of MMCT . . . to
> conduct [casino] games in the [S]tate does not terminate" the Tribes' obligation to
> pay the State royalties from their gaming activities;
>
> (2) the amendments "are approved or deemed approved by the Secretary . . .
> pursuant to the [IGRA] . . . and its implementing regulations";
>
> (3)–(4) the amendments "are approved by" the Connecticut legislature; and
>
> (5) the Tribes pass resolutions providing that the State may sue the Tribes if MMCT
> fails to pay any fees or taxes due to the State.

*Id*. § 14(c).  To satisfy the Act's conditions, the State and the Tribes agreed to amend the Pequot

Procedures and the Mohegan Compact to exempt MMCT from the exclusivity clauses.  Compl. ¶

27.

During the amendment process the Tribes allegedly requested technical assistance from

the Office of Indian Gaming, and according to Plaintiffs that Office "repeatedly informed

---

[8] Public Act 17-89 is available at https://www.cga.ct.gov/2017/ACT/pa/pdf/2017PA-00089-R00SB-00957-PA.pdf.  The Court takes judicial notice of this Act as a public record. *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of document posted on the District of Columbia's Retirement Board website); *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016) (taking judicial notice of "political and statistical facts that the Federal Election Commission has posted on the web").

representatives of the Tribes that it intended to approve" the amendments. *Id.* ¶¶ 28–31. The Tribes and the State duly approved and executed the amendments according to Tribal and State law, *id.* ¶ 33, and in late July and early August 2017, the Tribes requested that the Office of Indian Gaming formally approve the amendments. *See* Compl. ¶ 32; First Am. Compl. ("FAC") Ex. 1, ECF No. 60-2 at 21–69. Instead, the Secretary's office "return[ed]" the amendments to the Tribes and the State "to maintain the status quo," stating:

> We find that there is insufficient information upon which to make a decision as to whether a new casino operated by the Mohegan and Mashantucket Pequot Tribes (Tribes) would or would not violate the exclusivity clauses of the Gaming Compact [and Pequot Procedures]. The Tribes have entered an agreement with the State whereby they have agreed that the exclusivity [clauses] will not be breached by this arrangement. Therefore, our action is unnecessary at this time.

*See* Mem. Supp. Pls.' Mot. ("Pls.' Mem.") Ex 4, ECF No. 60-2 at 91–93;[9] *see also* Compl. ¶ 37. This response prompted the Tribes and the State to file suit in this Court.

The Tribes and the State initially claimed that because the Secretary did not explicitly disapprove their proposed amendments to the Pequot Procedures and the Mohegan Compact within 45 days, the IGRA required that the Secretary deem the amendments approved by law and publish notice of that approval in the Federal Register. *See id.* ¶¶ 40–60. Shortly after the complaint was filed, the Secretary approved the proposed amendments to the Mohegan Compact and published that approval.[10] *See* Tribal-State Class III Gaming Compact Taking Effect in the State of Connecticut, 83 Fed. Reg. 25,484 (June 1, 2018); First Joint Status Report at 1, ECF No. 41. This Court then concluded that the procedural requirements governing the Secretary's

---

[9] The Court takes judicial notice of these letters because they were incorporated by reference in the complaint and the proposed amended complaint. *See* Fed R. Civ. P. 12(b)(6); *Felder*, 595 F. Supp. 2d at 58–59; Compl. ¶ 37; FAC ¶¶ 50–52.

[10] Because the Mohegan received the relief sought in the complaint, the parties stipulated to the dismissal of the Mohegan's claims. *See generally* Stipulation of Dismissal, ECF No. 40.

approval of tribal-state compacts and compact amendments—including amendments to the Mohegan Compact—do not govern the Secretary's approval of secretarial procedures and procedures amendments—including amendments to the Pequot Procedures. *Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 318–19 (D.D.C. 2018). The Court dismissed the initial complaint on those grounds. *Id*. at 319–20.

Undeterred, the remaining Plaintiffs—the State and the Pequot—seek to press on with new theories. They have moved to amend their complaint to assert three new claims, discussed in greater detail below. *See* Pls.' Mot. For Leave to Amend Compl., ECF No. 60; FAC. Although the proposed claims are different than Plaintiffs' original claims, they arise from the same event: The Secretary's refusal to approve, or explicitly disapprove, the proposed amendments to the Pequot Procedures. The proposed claims also arise under the same cause of action as the original claims: The Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Despite these similarities, Defendants argue that the Court should deny Plaintiffs' motion to amend their complaint. Fed. Defs.' Opp'n to Pls.' Mot., ECF No. 62; MGM's Opp'n to Pls.' Mot., ECF No. 63. The issue has been fully briefed and is ripe for the Court's consideration.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) permits a plaintiff to amend its complaint once as a matter of course within 21 days of serving it or within 21 days of the filing of a responsive pleading. Fed. R. Civ. P. 15(a)(1). Otherwise, the plaintiff may amend its pleading only with the opposing party's written consent—which has been denied in this case—or the Court's leave. Fed. R. Civ. P. 15(a)(2).

"The decision to grant or deny leave to amend . . . is vested in the sound discretion of the trial court." *Commodore-Mensah v. Delta Air Lines, Inc.*, 842 F. Supp. 2d 50, 52 (D.D.C. 2012)

(citing *Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977)). And Rule 15 instructs courts to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Belizan v. Hershon*, 434 F.3d 579, 582 (D.C. Cir. 2006) (explaining that Rule 15 "is to be construed liberally"). Generous standard notwithstanding, courts may deny leave to amend for such reasons as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "Amendments that do not radically alter the scope and nature of the action . . . are especially favored." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 301 F.R.D. 5, 8 (D.D.C. 2013) (quoting *Estate of Gaither ex rel. Gaither v. District of Columbia*, 272 F.R.D. 248, 252 (D.D.C. 2011)). Finally, "[t]he party opposing the amendment bears the burden to show why leave should not be granted." *Flaherty v. Pritzker*, 322 F.R.D. 44, 46 (D.D.C. 2017) (citing *Dove v. Washington Metro. Area Trans. Auth.*, 221 F.R.D. 246, 247 (D.D.C. 2004)).

## IV.  ANALYSIS

Plaintiffs seek to add three claims to their complaint. First, Plaintiffs argue that "Federal Defendants' purported 'return' of the [Pequot Procedures amendments] was arbitrary and capricious on its face," particularly given the Secretary's approval of the identical Mohegan Compact amendment. Pls.' Mem. at 7, ECF No. 60-1; FAC ¶¶ 60–66. Second, Plaintiffs argue that "Federal Defendants' failure to approve the [Pequot Procedures amendments] was the product of improper political influence." Pls.' Mem. at 7; FAC ¶¶ 68–72. Third, Plaintiffs argue that the proposal containing the Pequot Procedures amendments itself is a compact under the IGRA, subject to the IGRA's compact approval procedures. Pls.' Mem. at 8; FAC ¶¶ 74–87.

Defendants argue that Plaintiffs' motion should be denied for two reasons. First, they contend that Plaintiffs have unduly delayed raising their new claims. Fed. Defs.' Opp'n at 6. Second, they contend that Plaintiffs' new claims are futile because they cannot survive a motion to dismiss. *Id.* The Court addresses each contention in turn. Though it frowns on Plaintiffs' apparent gamesmanship in filing their motion when they did, that gamesmanship does not rise to the level of undue delay justifying denying Plaintiffs' motion. And while one of Plaintiffs' proposed claims cannot survive a motion to dismiss, two likely can. Accordingly, the Court grants Plaintiffs' motion in part.

## A. Amendment Would Not Cause Undue Delay

Rule 15 does not prescribe a time limit in which a plaintiff may seek to amend a complaint. *See* Fed. R. Civ. P. 15(a). "Accordingly, a court should not deny leave to amend based solely on time elapsed between the filing of the complaint and the request for leave to amend." *Appalachian Voices v. Chu*, 262 F.R.D. 24, 27 (D.D.C. 2009) (citing *Atchinson v. District of Columbia*, 73 F.3d 418, 426 (D.C. Cir. 1996)). Rather, "[c]onsideration of whether delay is undue . . . should generally take into account the actions of other parties and the possibility of any resulting prejudice." *Atchinson*, 73 F.3d at 426 (citing *Sinclair v. Kleindienst*, 645 F.2d 1080, 1085 (D.C. Cir. 1981)); *see also Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1084 (D.C. Cir. 1998); *In re Vitamins Antitrust Litig.*, 217 F.R.D. 30, 33 (D.D.C. 2003) ("[D]elay without resulting prejudice to [the plaintiff] is not sufficient to warrant denial of plaintiffs' motion.").

Defendants fail to show that they will be prejudiced by Plaintiffs' alleged untimeliness. Nor could they. This case is in its infancy; Plaintiffs filed their motion to amend the complaint less than a year after filing the initial complaint, and approximately two weeks after the Court

dismissed that complaint.  The Court has not yet required Defendants to produce the administrative record.  *See Connecticut*, 344 F. Supp. 3d at 294.  And although Defendants have added certain factual allegations to their proposed amended complaint, their new claims arise from the same core set of events underlying the initial complaint—the Secretary's "return" of the proposed Pequot Procedures amendments.  *See Hill v. U.S. Dep't of Def.*, 70 F. Supp. 3d 17, 20 (D.D.C. 2014) (granting motion to amend where the "proposed amended complaint . . . [did] not meaningfully expand or alter the scope of [the plaintiff's] claims" and the defendant did "not argue that any prejudice resulted from [the] plaintiff's failure to seek to amend earlier.").

Seemingly conceding that Plaintiffs' motion to amend does not prejudice them directly, Defendants urge this Court to take a stand against what they view as Plaintiffs' unfair gamesmanship.  *See* Fed. Defs.' Opp'n at 7.  Defendants claim that Plaintiffs had the information necessary to amend their initial complaint before this Court dismissed it.  *Id*. at 8.  Instead, according to Defendants, Plaintiffs "wait[ed] in the wings" with their proposed amendments, seeking to assert them only when their first bite at the apple failed.  *Id*. at 9 (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008)); *see also* MGM's Opp'n at 7–9.

There appears to be some truth to this assertion.  Plaintiffs admit that their initial complaint contained "many of the facts on which the [new] theories of recovery are based."  Pls.' Mem. at 11; see also Pls.' Reply at 7, ECF No. 65 ("Perhaps Plaintiffs could have moved to amend to add Count II . . . sooner.").  To the extent Plaintiffs' proposed claims rely on the Secretary's approval of the Mohegan compact amendment, that approval occurred months before the Court dismissed Plaintiffs' initial complaint.  *See* FAC ¶ 57.  To the extent Plaintiffs' proposed claims rely on a refashioned interpretation of the IGRA, they could have advocated that interpretation at any time.  It is wholly implausible that Plaintiffs did not become aware of

"Federal Defendants' new reading of IGRA and its regulations" until the Court dismissed Plaintiffs' initial complaint, given that Federal Defendants asserted that "reading" in their motion to dismiss filed months before. *See* Pls.' Mem. at 11. And as Federal Defendants note, Plaintiffs themselves admitted their "interest" in waiting for the Court to evaluate their initial complaint before amending it. Joint Status Report at 3–4 (June 18, 2018), ECF No. 41.[11]

Defendants also correctly note that courts in this jurisdiction have denied motions to amend where the plaintiff either could have sought the amendment much earlier, or was attempting to evade a dispositive order. Those cases, however, typically involve (1) prejudicial circumstances not present here, *see Sai v. TSA*, 326 F.R.D. 31, 34–35 (D.D.C. 2018) (leave to amend sought after "four years and . . . a deluge of motions, supplemental submissions, conferences, and disputes"); *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 136 (D.D.C. 2013) (leave to amend sought "nearly a year after the Court already granted its prior motion to dismiss in relevant part"); *Becker v. District of Columbia*, 258 F.R.D. 182, 185 (D.D.C. 2009) (leave to amend sought after a five-year delay and after discovery had closed); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534, 2019 WL 161950, at *2 (D.D.C. Jan. 10, 2019) (leave to amend sought after the court "issued numerous lengthy Opinions, including expedited ones on preliminary-injunction motions") (2) later stages of litigation, *see Brown v. FBI*, 744 F. Supp. 2d 120, 123 (D.D.C. 2010) (leave to amend sought after the plaintiff's "claims were dismissed and summary judgment was entered against him"); *Key Airlines, Inc. v. Nat'l Mediation Bd.*, 745 F. Supp. 749, 750–51 (D.D.C. 1990) (leave to amend sought after the Court

---

[11] Plaintiffs argued in that status report that delaying amendment until after the Court's decision would "best conserve judicial resources." Joint Status Report at 4. Of course, this would only be true if the Court denied Defendants' motion to dismiss. Instead, the Court has expended more judicial resources evaluating what are essentially two motions to dismiss, rather than one.

granted summary judgment against the plaintiff); or (3) requests to expand the litigation beyond the initial complaint's scope, *see Brown*, 744 F. Supp. 2d at 123 (denying motion to add claims arising under statutes not initially raised).  And although *ACA Financial* involved circumstances similar to those here, it is not binding on this Court.

The Court does not condone Plaintiffs' gamesmanship, nor does it appreciate addressing in two opinions what it could have addressed in one.  However, because this action is at an early stage and because allowing Plaintiffs to amend their complaint will not unduly prejudice Defendants, the Court will not deny Plaintiffs' motion for undue delay.

### B.  Amendment Would Not Be Entirely Futile

"Denial of leave to amend based on futility is warranted if the proposed claim would not survive a motion to dismiss." *Onyewuchi v. Gonzalez*, 267 F.R.D. 417, 420 (D.D.C. 2010) (citing *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996)); *see also Williams v. Lew*, 819 F.3d 466, 471 (D.C. Cir. 2016).  In other words, "review for futility 'is, for practical purposes, identical to review of a Rule 12(b)(6)' motion to dismiss." *Driscoll v. George Washington Univ.*, 42 F. Supp. 3d 52, 57 (D.D.C. 2012) (quoting *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215–16 (D.C. Cir. 2010)).

Thus, "[i]n assessing a motion for leave to amend, the Court is required to assume the truth of the allegations in the proposed amended complaint and construe them in the light most favorable to the movant." *Flaherty*, 322 F.R.D. at 46 (citing *Caribbean Broad.*, 148 F.3d 1080, 1086 (D.C. Cir. 1998)).  However, the Court need not accept the proposed complaint's legal conclusions as true, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), nor must the Court presume the veracity of legal conclusions that are couched as factual allegations, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The proposed amended complaint "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). If the proposed amended complaint fails to meet this standard, the Court may deny Plaintiffs' motion as futile.

As noted, Plaintiffs' proposed amended complaint contains three counts, each of which asserts a slightly different APA violation. First, Plaintiffs claim that the Secretary's decision to "return" the proposed Pequot Procedures amendments without approving them is arbitrary and capricious on its face. FAC ¶¶ 59–66. Second, Plaintiffs claim that the Secretary's decision was impermissibly influenced by political pressure, rendering it arbitrary and capricious. *Id*. ¶¶ 67–72. Third, Plaintiffs claim that their agreement to amend the Pequot Procedures was itself a tribal-state compact under the IGRA, and thus that the Secretary was required by law to deem the Pequot Procedures amendments approved. *Id*. ¶¶ 73–87. Defendants argue that none of these counts plausibly state an APA violation. *See* Fed. Defs.' Opp'n at 11; MGM's Opp'n at 10.

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard of review requires a court to determine whether the action at issue was based on "reasoned analysis." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 57 (1983); *see also Cty. of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999). Generally, an agency has engaged in reasoned analysis when the administrative record indicates that it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "Where, however, the administrative record indicates that an agency 'relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' it has acted in an arbitrary and capricious manner." *Kort v. Burwell*, 209 F. Supp. 3d 98, 108 (D.D.C. 2016) (quoting *State Farm*, 463 U.S. at 43). Although this standard is not "particularly demanding," *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993), and a reviewing court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citing *Colo. Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 595 (1945)), a court is not to "supply a reasoned basis for the agency's action that the agency itself has not given," *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))).

Applying these principles and the IGRA's text to Plaintiffs' proposed amended complaint, the Court concludes that Plaintiffs' first two counts state plausible claims to relief, but their third count is unsupported by the plain text of the Department's regulations. Accordingly, Plaintiffs' proposed amended complaint would be futile only in part. Before explaining its reasons for reaching this conclusion, however, the Court must dispose of a threshold issue raised by Federal Defendants: Whether Plaintiffs have challenged a final agency action.

### 1. Final Agency Action

The APA limits judicial review to "*final agency action* for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). Thus, without final agency action, "there is no doubt that [Plaintiffs] would lack a cause of action under the APA." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003);

*see also Flytenow, Inc. v. FAA*, 808 F.3d 882, 888 (D.C. Cir. 2015). An agency action is "final if two independent conditions are met: (1) the action 'mark[s] the consummation of the agency's decisionmaking process' and is not 'of a merely tentative or interlocutory nature;' and (2) it is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)), *petition for cert. filed*, No. 18-722 (Nov. 30, 2018). "An [action] must satisfy both prongs of the *Bennett* test to be considered final." *Id.* (quoting *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016)). These principles dictate that Plaintiffs have challenged final agency here, despite Federal Defendants' arguments to the contrary.

First, the Secretary's letter "returning" the proposed Pequot Procedure amendments was, for all intents and purposes, the consummation of the Secretary's decisionmaking process. Plaintiffs asked the Secretary to approve their proposed amendments. *See* FAC Ex. 1. The Secretary reviewed the proposed amendments and declined to approve or deny them. To the extent that decision may be construed as agency inaction, it is reviewable "discrete" inaction. *See* 5 U.S.C. § 551(13) (defining "agency action" as including a "failure to act"); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–64 (2004) ("[A] 'failure to act' is properly understood to be limited, as are the other items in § 551(13), to a *discrete* action."); *Amador Cty. v. Salazar*, 640 F.3d 373, 382 (D.C. Cir. 2011) (holding that the Secretary's refusal to approve or disapprove a tribal-state compact, allowing the compact to become deemed approved under the IGRA, was "discrete" inaction justifying judicial review).

In addition, neither the Secretary's letter, the IGRA, or the Pequot Procedures themselves provide an avenue by which Plaintiffs may seek additional review and approval of their proposed

amendments. It appears that Plaintiffs' only recourse is to re-submit the proposal to the

Secretary and start the process anew. Without judicial review, the Secretary could keep

Plaintiffs in a perpetual cycle of re-submitting the proposed Pequot Procedures amendments,

only to have the Secretary "return" them for another re-submission. *See Sackett v. EPA*, 566

U.S. 120, 127 (2012) (agency order was final where it was "not subject to further agency

review"); *Soundboard Ass'n*, 888 F.3d at 1268–69 (advisory letter from agency staff was not

final agency action because the plaintiff "could, but did not, seek an opinion from the [agency]

itself"); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 437 (D.C. Cir. 1986) (where the agency had

"provided its final word on the matter," judicial review was appropriate).

Federal Defendants note that the letter's text suggests a preliminary, rather than final,

decision. The letter states that "action on the Amendment is premature and likely unnecessary,"

and that "there is insufficient information upon which to make a decision." FAC Ex. 4, ECF No.

60-2 at 93. True, this language suggests that a final decision may be forthcoming at some point.

But the letter states that the Department has "completed [its] review of the Amendment" and is

"return[ing] the Amendment" to Plaintiffs. *Id.* The Secretary's assertion that review is complete

belies any suggestion that further review is likely. Moreover, the letter does not identify the

additional information necessary to make a "final" decision, nor does it request anything of

Plaintiffs. Couching a final decision in preliminary terms does not make it less final. *See Scenic

Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016) (rejecting the agency's

"boilerplate" statement that it "may provide further guidance in the future as a result of

additional information"); *XP Vehicles, Inc. v. U.S. Dep't of Energy*, 118 F. Supp. 3d 38, 60, 78–

79 (D.D.C. 2015) (holding that an agency's letter declining to approve the plaintiff's loan

application was final agency action where the letter stated that the agency "would take no further

action with respect to [the plaintiff's] application until such time as [it] . . . submitted an application that is substantially complete").

Second, the Secretary's letter imposes significant legal and practical consequences on Plaintiffs. Plaintiffs seek to amend the Pequot Procedures' exclusivity clause, and thereby alter the contractual relationship between the State and the Pequot. Amending the Pequot Procedures would also satisfy Connecticut Public Act 17-89's final outstanding condition, and thereby authorize construction of the East Windsor casino. And the Pequot Procedures can only be amended with the Secretary's approval, a condition imposed by the Secretary. Pequot Procedures § 17. The Secretary's denial of that approval thus ossified Plaintiffs' legal relationship and Connecticut law. The Secretary's letter need not, as Federal Defendants claim, "compel[] the plaintiff to do anything," Fed. Defs.' Opp'n at 13; preventing Plaintiffs from moving forward with their casino project is enough under these circumstances. *See Soundboard Ass'n*, 888 F.3d at 1268 (suggesting that an agency's action is final where the plaintiff is "trapped without recourse due to the indefinite postponement of agency action").

The cases relied upon by Federal Defendants are not to the contrary, because they did not involve concrete, immediate consequences for the plaintiffs. *Independent Equipment Dealers Association v. EPA* involved an agency letter restating "in an abstract setting—for the umpteenth time—[the agency's] longstanding interpretation" of a regulation. 372 F.3d 420, 427 (D.C. Cir. 2004). The D.C. Circuit held that such "purely informational" agency communications are not final agency action. *Id*. at 427–28. That court similarly held in *Reliable Automatic Sprinkler* that "a statement of the agency's intention to make a preliminary determination . . . and a request for voluntary corrective action" were not final agency action because they did not impose an obligation, deny a right, or fix a legal relationship with respect to the plaintiff. 324 F.3d at 731–

32.  Here, however, the Secretary's letter returning the Pequot Procedures amendments is not purely informational.  It prevents Plaintiffs from altering their legal relationship with each other, it defeats the passage of Connecticut Public Act 17-89, and it thwarts Plaintiffs' East Windsor casino plans.  "Judicial review is authorized 'when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, [because] an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief.'"  *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 103 F. Supp. 3d 113, 121 (D.D.C. 2015) (alteration in original) (quoting *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987)).  The Secretary's decision to decline approving the Pequot Procedures amendments denied Plaintiffs relief, and the Court may review that decision.

## 2.  Count I

Having overcome that threshold obstacle, the Court must now consider, in determining whether Plaintiffs' motion to amend should be granted, whether Plaintiffs' three proposed amended claims are futile because they would not survive a motion to dismiss.  First, Plaintiffs claim that the Secretary's letter "returning" the proposed Pequot Procedures amendments without approving or disapproving them was "arbitrary and capricious on its face."  Pls.' Mem. at 12; FAC ¶¶ 60–66.  Plaintiffs' proposed amended complaint and briefing add color to this claim.  The FAC states that (1) the Secretary was "legally required to either affirmatively approve the [proposed amendments] or disapprove of [them] for one of the articulated reasons" in the IGRA, *id.* ¶ 62; and (2) "there is no legitimate basis to treat as approved the identical Mohegan Compact [amendments] and not approve the" proposed Pequot Procedures amendments, *id.* ¶ 64.  Plaintiffs' briefing frames the claim more broadly, stating that the Secretary "provided no legitimate basis to 'return' the [proposed amendments] as opposed to

approving [them]." Pls.' Mem. at 12. Plaintiffs' allegations are sufficient to survive a motion to dismiss, and are thus not futile.

As noted, to avoid a finding that a challenged agency action was arbitrary or capricious, the "agency must [have] . . . articulate[d] a satisfactory explanation for its action." *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *State Farm*, 463 U.S. at 43)). Here, Plaintiffs have sufficiently alleged that the Secretary's explanation for "returning" the proposed Pequot Procedures amendments without approving or disapproving them was not satisfactory, at least based on the record before the Court at this stage. The Secretary's letter states that "there is insufficient information upon which to make a decision." FAC Ex. 4 at 93. But it does not explain what additional information is necessary. The Secretary's letter also states that "action is unnecessary" because the Pequot have "entered an agreement with the State whereby they have agreed that the exclusivity provisions will not be breached by" the Tribes' joint venture. *Id*. But the Secretary's action is in fact necessary because the "agreement" between the Pequot and the State, by its text, requires the Secretary's approval. *See* FAC Ex. 1. Because the Secretary apparently did not grapple with that paradox— "returning" the proposed amendments invalidated the very "agreement" upon which the Secretary's decision was based—neither Plaintiffs, nor the Court at this stage, could understand why the agency "chose to do what it did." *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (quoting Henry J. Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 222 (1969)).

Thus, to the extent the Secretary explained his decision, Plaintiffs sufficiently allege that the explanation was conclusory at best. And "conclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C.

Cir. 2014) (quoting *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)); *see also CS-360, LLC v. U.S. Dep't of Veteran Affairs*, 846 F. Supp. 2d 171, 188, 192 (D.D.C. 2012) (remanding the defendant agency's decision to deny the plaintiff's application for inclusion on a list of veteran-owned small businesses, where "several of the grounds cited by the [agency] as a basis for denying [the plaintiff's] application . . . are described in such generalized and ambiguous terms that the Court is essentially left to guess as to the precise basis for the agency's decision").

Defendants identify certain flaws in Plaintiffs' explanation of their claim, but Defendants have not shown that the claim would be rejected at the motion to dismiss stage. First, Defendants take issue with the IGRA provisions upon which Plaintiffs appear to ground their claim. Plaintiffs' proposed amended complaint states that the Secretary could only disapprove the proposed Pequot Procedures amendments if the amendments violate "the IGRA, Federal law, or the trust obligations of the United States," and it cites 25 U.S.C. § 2710(d)(8)(B) in support. FAC ¶¶ 60–61. The FAC also states that § 2710(d)(8)(D) required the Secretary to publish the amendments' approval in the Federal Register, if approved. *Id.* ¶ 63. However, as Federal Defendants note, § 2710(d)(8) governs the approval and disapproval of tribal-state compacts, and this Court previously held that secretarial procedures—such as the Pequot Procedures—are not subject to the IGRA provisions governing compacts.[12] Fed. Defs.' Opp'n at 13–14; *see also*

_____

[12] Plaintiffs correctly note that the Court's prior Memorandum Opinion did not concern the substantive bases on which the Secretary can disapprove a tribal-state compact or secretarial procedures. *See Connecticut*, 344 F. Supp. 3d at 306–07. Rather, it concerned the time in which the Secretary must approve or disapprove a tribal-state compact compared to the time in which the Secretary must impose secretarial procedures. *See id.* That Opinion's logic, however, applies equally to both issues. By its plain terms the IGRA imposes different substantive and procedural requirements on the Secretary's treatment of tribal-state compacts than on the Secretary's treatment of secretarial procedures. Thus, the requirements governing tribal-state compacts do not apply to secretarial procedures.

*Connecticut*, 344 F. Supp. 3d at 318–19.  Accordingly, § 2710(d)(8) does not govern the actions the Secretary must take with respect to the Pequot Procedures.[13]

Second, Defendants take issue with Plaintiffs' reliance on the Secretary's decision to deem the Mohegan Compact amendments approved.  Plaintiffs' proposed amended complaint states that "there is no legitimate basis" for the Secretary to approve the Mohegan Compact amendments but not the proposed Pequot Procedures amendments.  FAC ¶ 64.  And it is true that "an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently."  *Transactive Corp. v, United States*, 91 F.3d 232, 237 (D.C. Cir. 1996).  But, Defendants note, the Secretary's action with respect to the Mohegan Compact amendments appears to be less decisive than Plaintiffs would have the Court believe.  The Secretary merely acknowledged that the Mohegan Compact amendments became "deemed approved" under the IGRA after 45 days.  *See* 83 Fed. Reg. at 25,484-01 (citing 25 U.S.C. § 2710(d)(8)(C)).  The Secretary does not appear to have considered the merits and legality of the Mohegan Compact amendments.  *See id.* (stating that the Mohegan Compact amendments are "considered to have been approved, but only to the extent [they are] consistent with IGRA").  And again, the IGRA provision requiring that the Mohegan Compact amendments be deemed approved, 25 U.S.C. § 2710(d)(8)(C), does not apply to the proposed Pequot Procedures amendments.[14]  *See* Fed. Defs.' Opp'n at 14–15; MGM's Opp'n at 10–12.

---

[13] That is not to say that the IGRA provides *no* principles to guide the Secretary's imposition of secretarial procedures and procedure amendments.  25 U.S.C. § 2710(d)(7), which governs secretarial procedures, states that the Secretary shall prescribe procedures "which are consistent with the proposed compact selected by the mediator . . . the [IGRA], and the relevant provisions of the laws of the [s]tate."  *Id.* § 2710(d)(7)(B)(vii)(I).

[14] As the Court noted in its prior Memorandum Opinion, there is a practical reason for this difference.  *See Connecticut*, 344 F. Supp. 3d at 313–14.  Tribal-state compacts result from negotiations between a tribe and a state; they thus simply require the Secretary's sign-off to the

That said, Plaintiffs' allegations are difficult to evaluate without the benefit of a full

administrative record.  Given documents showing the Department's decision-making process, it

may become apparent that the Secretary had good reason to neither approve or deny the

proposed Pequot Procedures amendments.  On the other hand, given the same documents,

Plaintiffs may demonstrate that the Secretary's disparate treatment of the proposed Mohegan

Compact amendments and Pequot Procedures amendments was improper, despite their different

statutory postures.  At this stage, the Court may only consider Plaintiffs' proposed allegations,

certain judicially noticed material, and the Secretary's letter "returning" the proposed Pequot

Procedures amendments; a letter providing little explanation for the Secretary's action.  "[A]

fundamental requirement of administrative law is that an agency set forth its reasons for

decision; an agency's failure to do so constitutes arbitrary and capricious agency action."

*Amerijet*, 753 F.3d at 1350 (quoting *Tourus Records*, 259 F.3d at 737).  Plaintiffs' proposed

amended complaint plausibly alleges that the Secretary failed to sufficiently explain his

treatment of the proposed Pequot Procedures amendments.  Plaintiffs will have the opportunity

to prove that allegation at the summary judgment stage.  They may amend the complaint to add

proposed Count I.

### 3.  Count II

Second, Plaintiffs claim that the Secretary's decision to not approve the proposed Pequot

Procedures amendments was the result of improper political influence.  FAC ¶¶ 69–71.

According to Plaintiffs, this political influence rendered the Secretary's decision arbitrary and

---

extent that they are consistent with the IGRA.  Secretarial procedures, on the other hand, require
the Secretary to consider the tribe's wishes and state and federal law, and then draft procedures
accordingly.  There is no document for the Secretary to "deem approved" to the extent it is
consistent with the IGRA, because the Secretary must create that document and ensure its
consistency with the IGRA *before* it is approved.  *See* 25 U.S.C. § 2710(d)(7)(B)(vii)(I).

capricious. *Id.* ¶ 71. Plaintiffs' allegations in support of this claim are again sufficient to survive a motion to dismiss, and are thus not futile.

As an initial matter, each party claims that the other side has misstated the standard the Court should apply to this "political influence" claim. In reality, they cite two different formulations of the same standard. Plaintiffs argue that the Secretary's decision was arbitrary and capricious if "extraneous factors intruded into the calculus of [the Secretary's] consideration," as the result of political pressure. Pls.' Reply at 23 (quoting *ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522, 1527 (D.C. Cir. 1994)); *see also D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971) (holding that an agency decision to approve a bridge project would be arbitrary and capricious where it was "based in whole or in part on the pressures emanating" from a United States Representative), *cert. denied*, 405 U.S. 1030 (1972). Defendants, on the other hand, argue that the Secretary's decision was arbitrary and capricious only if "(1) 'the content of the pressure upon the [decision-maker] [was] designed to force him to decide upon factors not made relevant by Congress in the applicable statute' and (2) 'the [decision-maker's] determination [was] affected by those extraneous considerations.'" MGM's Opp'n at 16 (quoting *Sierra Club v. Costle*, 657 F.2d 298, 409 (D.C. Cir. 1981)). Both formulations suggest that an agency's decision may be arbitrary and capricious if political pressure influenced the decision in a manner not dictated by the relevant statutes and regulations.[15] In other words, Plaintiffs must plausibly allege that political pressure caused the

---

[15] As Plaintiffs note, Defendants' formulation of the standard is pulled from a D.C. Circuit opinion evaluating an agency rulemaking, which did not occur here and which may allow for more political wrangling than an agency's adjudication of an individual request. *See Costle*, 657 F.2d at 409 ("We believe it entirely proper for Congressional representatives vigorously to represent the interests of their constituents before administrative agencies engaged in informal, general policy rulemaking."). That said, the standard delineated in *Costle* was based directly on

Secretary to rely on "considerations not made relevant by Congress in the" IGRA.[16] *Volpe*, 459 F.2d at 1246.

This standard involves two requirements. First, Plaintiffs must demonstrate that political pressure was applied to the agency's decisionmakers. *See Aera Energy LLC v. Salazar*, 642 F.3d 121, 221 (D.C. Cir. 2011) (evaluating whether "the agency successfully insulated its final decisionmaker from the effects of political pressure"); *ATX*, 41 F.3d at 1529 (focusing on the "nexus between the pressure and the decision maker"). Second, Plaintiffs must demonstrate that the pressure caused those decisionmakers to rely on improper factors. *See id.*, 41 F.3d at 1528 (holding that political pressure is only concerning when it "shapes the agency's determination of the merits" of a decision); *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 410 (D. Conn. 2008) ("The issue for the Court to determine is whether the evidence presented shows that the pressure exerted can be deemed to have actually influenced the decision maker who issued the [decision].").

At this stage, drawing all inferences in favor of Plaintiffs, their allegations in the proposed amended complaint satisfy both requirements. First, Plaintiffs allege that political pressure was brought to bear on the officials responsible for approving amendments to the Pequot Procedures: The Secretary and his team. *See* 25 U.S.C. § 2710(d)(7)(B)(vii); Pequot Procedures § 17. According to Plaintiffs, in the months leading up to the agency's action, the

---

the *Volpe* standard. *See id.* at 408–09; Fed. Defs.' Opp'n at 16; MGM's Opp'n at 19. The parties' disagreement appears to be more of terminology than of substance.

[16] Even "the appearance of bias or pressure" may be sufficient to render a quasi-judicial agency decision arbitrary. *ATX*, 41 F.3d at 1527. Plaintiffs admit that the decision at issue here was not quasi-judicial, so they must meet the more stringent *Volpe* standard. *See* Pls.' Reply at 24; *see also Sokaogon Chippewa Cmty. (Mole Lake Band of Lake Superior Chippewa) v. Babbitt*, 929 F. Supp. 1165, 1176 (W.D. Wis. 1996) ("A determination that the appearance of bias standard does not apply to [agency] decisionmaking does not mean that all contacts with the agency are permissible; it means only that interaction with the agency is not improper per se.").

Secretary had private meetings and conversations with a United States Senator, Dean Heller, and the White House Deputy Chief of Staff, Rick Dearborn, both of whom pressured the Secretary to not approve the proposed Pequot Procedures amendments. *See* FAC ¶¶ 43, 48–49. Around the same time, according to Plaintiffs, United States Representative Mark Amodei similarly pressured Assistant Deputy Secretary of the Interior James Cason. *See id*. ¶¶ 46–47. Plaintiffs note that Senator Heller and Representative Amodei represent the citizens of Nevada, in which MGM is a major employer and political backer. *Id*. ¶¶ 40–42, 45. And they state that Mr. Cason told the Tribes that the Department was receiving political pressure to not approve the proposed Pequot Procedures amendments. *Id*. ¶ 44. Plaintiffs have thus plausibly alleged a "nexus" between the political pressure and the agency decision makers. *ATX*, 41 F.3d at 1530.[17]

Second, Plaintiffs allege that the political pressure caused the Secretary to make a decision that was not dictated by the IGRA. Plaintiffs claim that up until days before the Secretary's decision, "the Tribes were assured by Department officials that once they submitted the [proposed amendments] the Department would approve them." FAC ¶ 30; *see also id*. ¶¶ 35–39. Plaintiffs identify multiple meetings, conversations, and letters in which these alleged assurances were made. *See id*. ¶ 29 (technical assistance letter), ¶ 36 (meeting with Mr. Cason); *id*. Ex. 2 (Department email chain referencing a "draft approval letter" for the Pequot Procedures amendments), ECF No. 60-2 at 71–79. However, according to Plaintiffs, the Secretary reversed course at the eleventh hour and "returned" the proposed Pequot Procedures amendments to

---

[17] MGM asserts that even if forces opposed to the Tribes' casino project pressured the Secretary to kill the project, Plaintiffs also pressured the Secretary in the opposite direction. MGM's Opp'n at 18–19. Such a claim is not before the Court, however, and two wrongs do not make a right.

Plaintiffs in a letter cc'ing the Nevada congressional delegation. *See id.* ¶¶ 49–50, 52; *id.* Ex. 4 at 93.

Plaintiffs' allegation that the Secretary "suddenly [] reverse[d] course" creates the plausible inference that political pressure may have caused the agency to take action it was not otherwise planning to take.[18] *ATX*, 41 F.3d at 1529 ("If the decision maker were suddenly to reverse course or reach a weakly-supported determination . . . we might infer that pressure did influence the final decision."); *cf. Press Broad. Co., Inc. v. FCC*, 59 F.3d 1365, 1370 (D.C. Cir. 1995) (noting that the agency's "quick reinstatement of [a competitor's] permit on the basis of flawed reasoning . . . falls squarely within the holding of *ATX*"). And the vague, cursory reasoning provided in the Secretary's "return" letter—the only decision-related record before the Court—provides the Court with no basis, at this stage, to conclude that the decision to neither approve or deny Plaintiffs' proposed procedure amendments was based on appropriate considerations. *See XP Vehicles*, 118 F. Supp. 3d at 78–79 (allowing the plaintiffs' APA claim to survive a motion to dismiss where the plaintiffs alleged that their loan application "was sidelined in favor of those submitted by competitor companies with political connections" and the agency's reason for the denial was a "mere pretext" to protect the competition).

The administrative record or other evidence may ultimately demonstrate that the alleged political pressure did not occur or affect the Secretary's decision. *See Aera Energy*, 642 F.3d at 221 ("[O]ur political influence cases emphasize the value of establishing a full scale administrative record which might dispel any doubts about the true nature of the agency's

---

[18] Apparently, Plaintiffs are not alone in this theory. Plaintiffs note that several media outlets and the Department's Inspector General are investigating the conduct underlying the decision not to approve the Pequot Procedures amendments. *See* FAC ¶¶ 55–56; Pls.' Notice of Suppl. Auth., ECF No. 66.

action." (alterations and internal quotation marks omitted)).  But at this stage, Plaintiffs have

plausibly alleged that significant political pressure was brought to bear on the issue and the

Secretary may have improperly succumbed to such pressure.  Because Defendants have failed to

demonstrate that these allegations would be futile, Plaintiffs may amend the complaint to add

proposed Count II.[19]

### 4.  Count III

Third, and finally, Plaintiffs claim that their agreement to amend the Pequot Procedures is

itself a "tribal-state gaming compact under the IGRA and its implementing regulations."  FAC ¶

78.  Plaintiffs thus claim that the IGRA required the Secretary to deem the proposed amendments

approved 45 days after they were submitted, and to publish that approval in the Federal Register

shortly thereafter.  *Id*. ¶¶ 80–84.  This creative twist on Plaintiffs' previous arguments does not

hold up to the statutory text.

In interpreting the IGRA and its implementing regulations, this Court must start "with the

plain meaning of the text, looking to the 'language itself, the specific context in which that

language is used, and the broader context of the statute as a whole.'"  *Blackman v. District of

Columbia*, 456 F.3d 167, 176 (D.C. Cir. 2006) (quoting *United States v. Barnes*, 295 F.3d 1354,

1359 (D.C. Cir. 2002)).  Likewise, the Court's interpretation of Plaintiffs' proposed amendments

to the Pequot Procedures, "like statutory and treaty interpretation, must begin with the plain

meaning of the language."  *Am. Fed'n of Gov't Emps., Local 2924 v. Fed. Labor Relations Auth.*,

---

[19] This conclusion should not be read to suggest any impropriety or illegality in the
actions of Senator Heller, Representative Amodei, or Mr. Dearborn.  "They are surely entitled to
their own views on [the Tribes' casino plans], and [the Court] indicate[s] no opinion on their
authority to exert pressure" on the Secretary.  *Volpe*, 459 F.2d at 1249.  The Court concludes
merely that Plaintiffs have plausibly alleged that the Secretary considered extraneous factors in
declining to approve the proposed Pequot Procedures amendments.

470 F.3d 375, 381 (D.C. Cir. 2006). The Court's analysis here begins and ends with that plain meaning.

First, the Court must define a tribal-state compact. The IGRA does not provide a definition but, as Plaintiffs note, the Department's regulations do. The relevant regulations state that a

> Compact or Tribal–State Gaming Compact means an intergovernmental agreement executed between Tribal and State governments under the Indian Gaming Regulatory Act that *establishes* between the parties the terms and conditions for the operation and regulation of the tribe's Class III gaming activities.

25 C.F.R. § 293.2 (emphasis added). This definition prompts the question of what it means to "establish" the terms and conditions of gaming. Neither the IGRA nor the Department define the term "establish," but common definitions of "establish" are instructive here. Black's Law Dictionary defines the term, in relevant part, as "to enact permanently . . . [t]o make or form; to bring about or into existence." *Establish*, Black's Law Dictionary (10th ed. 2014). Webster's Dictionary similarly defines "establish" as "to institute . . . permanently by enactment or agreement" or "to bring into existence." *Establish*, Merriam-Webster's Dictionary (Jan. 25, 2019), https://www.merriam-webster.com/dictionary/establish. Thus, a tribal-state compact is an agreement creating the terms under which the tribe may conduct gaming.

Next, the Court must determine whether Plaintiffs' proposed Pequot Procedures amendments meet that definition. The proposal is framed as an "agreement" between the Pequot and the state. FAC Ex. 1 at 48. It, in relevant part, seeks to "modify" and "amend" certain sections of the Pequot Procedures. *Id*. at 48–49. Those amendments prevent the creation of "a business entity jointly and exclusively owned by the [Pequot] and the [Mohegan]" from triggering certain rights for the Pequot under the Procedures, such as the right to conduct Class III gaming based on a state law amendment, *id*. at 48, or the right to negotiate a tribal-state

compact governing types of Class III gaming that were not permitted when the Procedures were imposed, but were "subsequently so permitted by the state," *id*. at 49. In other words, the proposal seeks to prevent the establishment of the Tribes' joint venture under Connecticut law from disrupting the existing framework—the Pequot Procedures—governing the Pequot's gaming activities.

The proposed Pequot Procedures amendments plainly fall outside of the Department's definition of a tribal-state compact. The proposal may be an "intergovernmental agreement executed" between the Pequot and the State, unlike the Pequot Procedures. But it does not "establish" the terms and conditions of the Pequot's Class III gaming activities. Those terms and conditions are already established by the Pequot Procedures. The proposed amendments do not replace the Pequot Procedures and enact new terms and conditions, but merely protect those terms and conditions against the creation of the Tribes' joint venture. Plaintiffs' proposal makes this clear: it seeks to "confirm" that "the enactment of any Connecticut law to authorize" the Tribes' joint venture "shall *not affect* the rights and responsibilities of the [Pequot] under the [Pequot] Procedures." FAC Ex. 1 at 48 (emphasis added). Thus, Plaintiffs' proposed Count III cannot withstand a motion to dismiss, and amendment would be futile.

## V. CONCLUSION

For the reasons stated above, the Court concludes that allowing Plaintiffs to amend their complaint would not cause undue delay, but would be futile as to proposed Count III because that claim could not survive a motion to dismiss. *See Foman*, 371 U.S. at 182. Thus, exercising its discretion under Federal Rule of Civil Procedure 15, the Court **GRANTS IN PART** Plaintiffs' Motion to Amend (ECF No. 60). It is hereby **ORDERED** that on or before February 22, 2019, Plaintiffs may file an amended complaint containing Counts I and II of their proposed

amended complaint (ECF No. 60-2), but not Count III.  An order consistent with this

Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 15, 2019                                    RUDOLPH CONTRERAS
                                                                              United States District Judge