**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF CONNECTICUT, MOHEGAN )<br>TRIBE OF INDIANS OF CONNECTICUT, )<br>and MASHANTUCKET PEQUOT TRIBE )<br> )<br>              *Plaintiffs*, )<br> )<br>       v. )<br> )<br>DAVID BERNHARDT, in his official capacity )<br>As Acting Secretary of the Interior, and the )<br>UNITED STATES DEPARTMENT OF THE )<br>INTERIOR, )<br> )<br>              *Defendants*, )<br> )<br>and )<br> )<br>MGM RESORTS GLOBAL )<br>DEVELOPMENT, LLC, )<br> )<br>       *Intervenor-Defendant.*) | No. 1:17-cv-02564-RC |

**FIRST AMENDED COMPLAINT**

**Introduction**

1.      This action arises out of Plaintiffs' submission of an amendment to the gaming compact adopted as secretarial procedures of the Plaintiff Mashantucket Pequot Tribe for review and approval by the Secretary of the Interior ("the Secretary"). Rather than approving or disapproving the amendment, as required by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq*., and its implementing regulations, the Secretary "returned" it to the Plaintiffs. Defendants' failure to approve the amendment was a direct result of undue political influence and is arbitrary, capricious and otherwise not in accordance with the law. Thus, Plaintiffs seek a declaration that Defendants' inaction is arbitrary and

capricious and injunctive relief requiring the Secretary to comply with the law by approving

the amendment and publishing the approval in the Federal Register.

## Parties

2.      Plaintiff State of Connecticut ("State") is a sovereign state of the United

States. The Attorney General brings this action on behalf of the State of Connecticut at the

request of Governor Dannel P. Malloy to protect the interests of the state. Conn. Gen. Stat. §

3-5.

3.      Plaintiff Mashantucket Pequot Tribe ("Pequot Tribe" or "Tribe") is a

federally recognized Indian tribe, and, pursuant to the IGRA, it currently operates "Class III"

gaming in Connecticut in accordance with a tribal-state gaming compact that was selected by

a mediator and prescribed as procedures by the Secretary. Notice of the prescribed procedures

or compact was published in the Federal Register at 56 Fed. Reg. 24,996 (May 31, 1991).

4.      Defendant David Bernhardt, the Acting U.S. Secretary of the Interior, is

sued in his official capacity. Pursuant to the IGRA, the Secretary and his delegates are

charged with reviewing tribal-state compacts and amendments thereto governing Class III

gaming on tribal land and approving or disapproving of said compacts and amendments.

Secretary Zinke is responsible for the actions and omissions described in this Complaint.

5.      Defendant U.S. Department of the Interior is an administrative agency of the

United States responsible for administering and executing IGRA's requirements. The

Department includes the Office of Indian Gaming and the Secretary's delegates, such as

Michael Black, former Acting Assistant Secretary for Indian Affairs ("AS-IA"). The

Department is responsible for the actions and omissions described in this Complaint. The

Department has an address at 1849 C Street, N.W., Washington, D.C. 20240.

6.      Pursuant to the IGRA and other federal statutes, Congress has entrusted the Secretary and the Department with the duty of carrying out Congress's goals of promoting tribal economic development and self-governance and executing the federal government's trust responsibility to Indian nations.

7.      Defendant/Intervenor MGM Resorts Global Development, LLC ("MGM") is a commercial casino operator and an employer, *inter alia,* in the State of Nevada.

8.      In granting MGM's motion to intervene on September 29, 2018, the Court set certain conditions on the intervention. Doc. 59.

**Jurisdiction and Venue**

9.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question statute) because it arises under the laws of the United States; 28 U.S.C. § 1362 because this is a civil action by a tribe arising under the laws of the United States; and the Mandamus and Venue Act, codified at 28 U.S.C. § 1361, because Plaintiffs seek an order to direct the Defendants to act as required by federal law.

10.     This suit alleges that the Department and the Secretary have failed to act in accordance with the IGRA. Accordingly, the Defendants have consented to suit under the Administrative Procedure Act, 5 U.S.C. § 702.

11.     The requested relief is available under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Mandamus and Venue Act, 28 U.S.C. § 1361.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(e) because (a) a substantial part of the events, actions, and/or omissions giving rise to the claims in this complaint occurred in this judicial district, and/or (b) the Defendants reside in this judicial district.

**Statutory and Regulatory Background**

13.     IGRA, 25 U.S.C. §§ 2701-2721, provides a comprehensive regulatory framework for gaming activities on Indian lands which seeks to protect the interests of tribes and support tribal economic development and self-sufficiency.

14.     IGRA provides that Indian tribes may conduct Class III gaming on Indian lands in accordance with gaming compacts with states in which those lands are located, including mediator-selected compacts that are initially issued as procedures. Pursuant to IGRA, the Secretary has the authority to approve these compacts under strict deadlines and conditions.

15.     Pursuant to the IGRA and its implementing regulations, the Secretary may only disapprove a compact or amendment for three reasons: (i) it violates the IGRA, (ii) it violates any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or (iii) it violates the trust obligations of the United States to Indians. *See* 25 U.S.C. § 2710(d)(8)(B); 25 C.F.R. § 293.14; *see also* 25 U.S.C. § 2710(d)(7)(B)(vii)(I) (providing that the Secretary "shall prescribe," in consultation with the relevant Indian tribe, procedures which are consistent with a mediator selected-compact, IGRA, and relevant provisions of State law).

16.     Once a compact or amendment is affirmatively approved or deemed approved by operation of law, IGRA and its implementing regulations provide that the Secretary "*shall* publish in the Federal Register notice of any Tribal-State compact that is approved, or considered to have been approved[.]" 25 U.S.C. § 2710(d)(8)(D) (emphasis added).

17.     The Secretary must publish such notice of approval in the Federal Register within 90 days from the date the compact is received by the Office of Indian Gaming. 25 C.F.R. § 293.15(b).

18.     A compact or amendment takes effect on the date that notice of its approval is published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B); 25 C.F.R. § 293.15(a).

19.     The Secretary has no authority to avoid IGRA's Federal Register publication requirement by placing an approved compact or amendment in limbo. 25 U.S.C. § 2710(d)(8)(D); 25 C.F.R. § 293.15. The Secretary has no authority to refuse to publish notice of an approved or deemed approved compact or amendment in the Federal Register. *Id.*

### Factual Background

20.     This action involves the "AGREEMENT BETWEEN THE MASHANTUCKET PEQUOT TRIBE AND THE STATE OF CONNECTICUT," dated July 20, 2017 and related Memorandum of Understanding also dated July 20, 2017 ("Tribal-State Agreement") submitted for review and approval to Federal Defendants pursuant to the IGRA and its implementing regulations. The Tribal-State Agreement was received by Federal Defendants on August 2, 2017.

21.     The Tribal-State Agreement amends a mediator-selected tribal-state gaming compact between the Tribe and the State of Connecticut that the Secretary reviewed and approved and, with minor technical amendments, published notice of in the Federal Register on May 31, 1991 ("Secretarial Procedures").  The Tribal-State Agreement is consistent with the Secretarial Procedures, IGRA, and relevant provisions of Connecticut law.

22.     The Secretarial Procedures themselves contain clear direction as to how the State and Tribe may modify or amend the terms of the Secretarial Procedures. Section 17 of

the Secretarial Procedures states: "The terms and conditions of this Compact shall not be modified, amended or otherwise altered except by written agreement of both parties and enactment as set forth in sub-section (a)." Sub-section (a) provides that "This Compact shall be effective upon publication of notice of approval by the Secretary of the Interior of the United States in the Federal Register in accordance with 25 U.S.C. Section 2710(d)(3)(B)."

23.    In 1994, pursuant to IGRA, the Secretary also approved a gaming compact for the Mohegan Tribe of Indians of Connecticut (the "Mohegan Tribe"), a federally recognized Indian tribe ("Mohegan Compact"). Notice of that approval was published in the Federal Register at 59 Fed. Reg. 65,130 (Dec. 16, 1994). The amendment provision in the Mohegan Compact is identical to the amendment provision in the Secretarial Procedures.

24.    In or about 2015, the Pequot Tribe and the Mohegan Tribe (collectively, "Tribes") began to consider amending their respective compacts and related Memoranda of Understanding between the Tribes and the State to clarify that the Tribes' operation of a joint venture commercial gaming facility outside of either Tribe's Indian lands would not alter or compromise the Tribes' existing arrangements with the State.

25.    On April 12, 2016, the Tribes advised the Department's Office of Indian Gaming that they had formed a joint venture for the purpose of constructing and operating a commercial gaming facility in Connecticut, and asked the Office to review and provide technical assistance to their draft agreements to amend their respective compacts including the Tribal-State Agreement.

26.    On April 25, 2016, the Department determined in a letter that the Tribe's April 12, 2016 materials "generally confirms that a proposed State of Connecticut (State) law authorizing a new State-regulated casino would not violate the Tribe's existing exclusivity

arrangement if the casino is jointly and exclusively owned by the Tribe and the Mohegan

Tribe." The Department did not identify any needed modifications of the Tribal-State

Agreement to obtain approval or any additional information that would be required by the

Department. The Mohegan Tribe received a materially identical letter from the Department.

27.      In light of a 2017 opinion issued by the Connecticut Attorney General, the

Tribes sought further technical assistance from the Office of Indian Gaming on April 19,

2017.

28.      On May 12, 2017, the Department again issued a letter to the Pequot Tribe

which stated that the Department "confirm[s] that the current Administration supports the

views expressed in the [April 25, 2016] technical assistance letter." The Department also

emphasized that "[t]he proposed State legislation provided to us, could enhance rather than

diminish the Tribes' exclusivity rights." *Id.* Again, the Department did not identify any

needed modifications of the Tribal-State Agreement to obtain approval or any additional

information that may be needed to review and approve. The Mohegan Tribe received a

materially identical letter from the Department.

29.      Throughout this period from April 2016 through the summer of 2017, the

Tribes' representatives had numerous in-person and telephonic meetings with Department

officials both in the Obama and Trump Administrations in which the Tribes were assured by

Department officials that once they submitted the Mohegan Compact Amendment and the

Tribal-State Agreement the Department would approve them.

30.      On or about June 27, 2017, the Connecticut General Assembly passed Public

Act 17-89, which authorized the Tribes' joint venture to operate a casino in East Windsor

Connecticut, subject to certain conditions including amendment of each Tribe's Compacts and associated MOUs.

31.     MGM reportedly spent $3.8 million dollars lobbying in Connecticut in 2018 to oppose PA 17-89. *See* Mark Paznoikas, *MGM Spends $3.8 Million Lobbying in Hartford But win in Washington*, Connecticut Mirror (02/02.2018), available at: https://ctmirror.org/2018/02/02/mgm-spends-3-8m-lobbying-in-hartford-but-wins-in-washington/.

32.     Relying on the Department's repeated assurances that the Tribal-State Agreement would not violate the existing exclusivity arrangement and would be approved, the Tribe formally submitted the Tribal-State Agreement for approval of the Department, pursuant to IGRA and its implementing regulations, and were both received by the Department on August 2, 2017.  At the same time, the Mohegan Tribe submitted to the Department an agreement materially similar to the Tribal-State Agreement.  These requests for approval are attached as Exhibit 1.

33.     The Tribal-State Agreement was approved and executed by the appropriate authorities of the Pequot Tribe in accordance with the applicable tribal laws and the Secretarial Procedures. It was also approved and executed by the appropriate authorities of the State of Connecticut under the Constitution and laws of the State of Connecticut. Accordingly, the Tribal-State Agreement as submitted to the Defendants are validly entered into.

34.     On or about August 11, 2017, Department officials once again orally notified the Tribes that approval of the Tribal-State Agreement and the Mohegan agreements was forthcoming in the coming days.

35.     On or about August 15, 2017, the Tribe met with Associate Deputy Secretary ("ADS") Cason and ADS Cason confirmed that the Department had no issues or questions regarding the Tribal-State Agreement and would approve it along with the amendment to the Mohegan Compact.

36.     On or about August 21, 2017, the Tribe re-confirmed with the Department that the Department had no issues or questions regarding the Tribal-State Agreement and it would be approved.

37.     On or about September 8, 2017, Department officials advised the Tribes that the Department had prepared draft approval letters.

38.     Consistent with the idea that approval was imminent, on September 11, 2017, Troy Woodward, Senior Policy Advisor of Office of Indian Gaming, circulated electronic "draft approval" letters of "the edited letters for Pequot and Mohegan." This September 11, 2017 letter is attached as Exhibit 2.

39.     However, despite the Department's repeated affirmations to the Tribe that the Tribal-State Agreement would be approved and widespread acknowledgment among the Department's experts that there was no basis to disapprove the Tribal-State Agreement, the Department ultimately buckled under undue political pressure from both Senator Dean Heller (R-NV) and Representative Mark Amodei (R-NV-02).

40.     According to the Center for Responsive Politics, MGM is the single largest contributor since 2005 to Senator Heller. Upon information and belief, Senator Heller has on numerous occasions attempted to use his political influence to achieve MGM's business objectives.

41.     Senator Heller has previously attempted to prevent the Tribes from moving forward with their project. When MGM became aware in 2016 that the Tribe was considering the Tribal-State Agreement, Senator Heller proposed an amendment to a defense bill that would have prevented Indian tribes from operating commercial casinos in the same state where they operate casinos on a reservation. *See* S. 4586, 114th Cong. (2016). The amendment failed.

42.     Upon information and belief, Senator Heller directly pressured Secretary Zinke to do what was necessary to stop the Tribes' joint venture casino project during a private dinner at a steakhouse in Las Vegas, Nevada, on or about July 30, 2017.

43.     During this same time frame, ADS Cason told the Tribes that members of Congress were starting to pressure the Department to not approve the forthcoming Tribal-State Agreement but he also assured the Tribes that the Department had no intent to reverse course.

44.     Upon information and belief, MGM also provides and has consistently provided large contributions to Representative Amodei. Representative Amodei, on MGM's behalf, has opposed the Tribal-State Agreement.

45.     Upon information and belief, on or about September 13, 2017, Representative Amodei summoned ADS Cason to his congressional office for a meeting that lasted no less than an hour. Upon information and belief, Representative Amodei pressured the Department to change its position.

46.     Upon information and belief, on or about September 14, 2017, Senator Heller called ADS Cason to further pressure the Department to disapprove the Tribal-State Agreement.

47.     Following that call, upon information and belief, Secretary Zinke visited the White House to meet with Deputy Chief of Staff Rick Dearborn who, exerting Executive-level pressure, requested the Department to not approve the Tribal-State Agreement.

48.     Upon information and belief, Senator Heller made another call to Secretary Zinke on the morning of September 15, 2017—just hours before the Department was set to issue its decision to the Tribe—to provide additional political pressure compelling the Department to withhold approval of the Tribal-State Agreement.

49.     In response to the extraordinary political pressure placed on Department officials principally by Senator Heller and Congressman Amodei, the Department abruptly reversed over 17 months of consistent assurances to the Tribes that the Tribal-State Agreement and the Mohegan Compact Amendment would be approved and, instead, sent materially identical letters to the Tribes (hereinafter referred to as the "September 15, 2017 Letters"), in which the Department purported to "return" the Tribal-State Agreement and the Mohegan Compact Amendment to "maintain the status quo" because action was "premature and likely unnecessary." The Department's conclusory letter did not explain the Department's rationale or provide any reasoning for the decision.

50.     The Department further stated that there was "insufficient information upon which to make a decision," even after repeatedly assuring the Tribe that no additional information was needed.

51.     The September 15, 2017 Letters did not state what additional information the Department needed.

52.     The September 15, 2017 Letters stated that "action is unnecessary" because the Tribes had "entered into an agreement with the State whereby they have agreed the

exclusivity provisions will not be breached."  However, the Department did not explain why approval was unnecessary in light of the provisions in Section 17 of the Secretarial Procedures.

53.     Additionally, the Department expressly carbon copied both Senator Heller and Representative Amodei on the September 15, 2017 Letters.  No one else was copied on the September 15, 2017 Letters.  The September 15, 2017 Letters are attached as Exhibit 4.

54.     Knowing that this unfounded reversal in course and supposed "return" of the Tribal-State Agreement was unsupported by law or fact, Secretary Zinke refused to take calls from the Tribes regarding the Department's decision, which, upon information and belief, he dubbed the "MGM matter."

55.     On the same day that the Tribes received the September 15, 2017 Letter, Pequot Chairman Butler sent a letter to the Department stating, *inter alia*, that "[w]e confirmed weeks ago with the Department that the Department required no further information to complete its review of our Compact amendments. There is no justification under the Indian Gaming Regulatory Act for the Department to take any action other than approval of the Compact amendments." This September 15, 2017 Letter is attached as Exhibit 5.

56.     In April 2018, the Department's Inspector General confirmed that it was investigating the Department's conduct in handling the Tribes' request to approve the Tribal-State Agreement and the Mohegan Compact Amendment.

57.     Additionally, on February 1, 2018, POLITICO published an article chronicling the events leading up to the Department's unexpected decision, including MGM's lobbying efforts and undisclosed meetings between Nevada's congressional representatives

and key Department officials, and raised questions as to whether the Department's decision-making process was ultimately tainted by political and private interests. *See* Juliano, Nick. *Zinke's agency held up Indians' casino after MGM lobbying*, POLITICO (Feb. 1, 2018), *available at* https://www.politico.com/story/2018/02/01/zinkes-indian-casino-interior-312671; *see also* Juliano, Nick. *Interior rejected staff advice when scuttling tribes' casino, documents suggest*, POLITICO (Apr. 20, 2018), *available at* https://www.politico.com/story/2018/04/22/tribes-casino-approval-trump-zinke-494541. Other media outlets have also published similar stories, which accounts are incorporated herein by reference. *See, e.g.,* Greenwood, Max. *Interior Dismissed Experts' Recommendations in Blocking Tribes' Casino: Report*, The Hill (Apr. 22, 2018), *available at* https://www.google.com/amp/s/thehill.com/regulation/lobbying/384340-interior-dismissed-experts-recommendations-in-blocking-tribes-casino%3famp; Rein, Lisa et al., *HUD Appointee, Abruptly Moved to Lead Interior Dept.'s Watchdog Unit Amid Zinke Probe*, The Washington Post (Oct. 16, 2018) (reporting the Secretary met with lobbyists for MGM and overruled recommendation from Department staff, raising questions of improper political influence), *available at* https://www.washingtonpost.com/politics/hud-political-appointee-abruptly-moved-to-lead-interiors-watchdog-office-amid-ongoing-investigations-into-zinke/2018/10/16/30de03b4-d164-11e8-83d6-291feead2ab1_story.html?utm_term=.3e57545f52c3; Zapotsky, Matt, et al., *Justice Dept. Investigating Whether Zinke Lied to Inspector General*, The Washington Post (Jan. 3, 2019) (discussing a DOJ investigation into whether former Secretary Zinke lied to the Department's inspector general investigators in the context of their inquiry into his involvement with the subject matter of this case), *available at* https://www.washingtonpost.com/world/national-

security/justice-dept-investigating-whether-zinke-lied-to-inspector-

general/2019/01/03/6c9dea06-0eac-11e9-84fc-

d58c33d6c8c7_story.html?utm_term=.787823f14f03.

58.     On June 1, 2018, the Department published notice in the Federal Register that

Mohegan's amendments to its Compact and MOU had been deemed approved.  83 Fed. Reg.

25484 (June 1, 2018).

59.     The Tribal-State Agreement, despite being materially identical to the

agreement between the State and the Mohegan Tribe that was approved, has still not been

approved or published in the Federal Register.

60.     The Defendants have not articulated a satisfactory, reasoned explanation for

their action with respect to the Tribal-State Agreement, particularly for their disparate

treatment of the Tribal-State Agreement and the Mohegan Amendment, which are

functionally identical.

## COUNT I

### Defendants' Inaction in Failing Approve the Tribal-State Agreement
### and Publish Notice of its Approval Was Arbitrary and Capricious

61.     The foregoing allegations are re-alleged and incorporated by reference as if

restated fully herein.

62.     Under the IGRA, Defendants are obligated to approve or disapprove a

compact or amendments to a compact if that compact violates the IGRA, any provision of

Federal law that does not relate to jurisdiction over gaming on Indian lands, or the trust

obligations of the United States to Indians. 25 U.S.C. § 2710(d)(8)(B).

63.     The Tribal-State Agreement submitted by Plaintiffs did not violate the IGRA,

Federal law, or the trust obligations of the United States.

64.     Defendants were legally required to either affirmatively approve the Tribal-State Agreement or disapprove of it for one of the articulated reasons.

65.     If approved, defendants were also legally required under to publish notice of approval of the Tribal-State Agreement in the Federal Register. 25 U.S.C. § 2710(d)(8)(D).

66.     In failing to affirmatively approve Plaintiffs' Tribal-State Agreement, Defendants' inaction was arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A) because there is no legitimate basis to treat as approved the identical Mohegan Compact and not approve the Tribal-State Agreement.  Treating agreements which function identically in the real world differently is the very definition of arbitrary and capricious.

67.     In failing to publish notice of approval of the Tribal-State Agreement in the Federal Register, Defendants' inaction was arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

68.     Accordingly, Plaintiffs seek a declaratory judgment that the Defendants' failure to approve the Tribal-State Agreement and failure to publish notice of approval was arbitrary and capricious, and not in accordance with law and an order mandating publication of the Tribal-State Agreement as an approved gaming amendment forthwith.

## COUNT II

**The Department's Failure to Approve the Tribal-State Agreement Was
a Result of Undue Political Influence And Accordingly, Arbitrary and Capricious**

69.     The foregoing allegations are re-alleged and incorporated by reference as if restated fully herein.

70.     Congressional interference by the Nevada delegation and the White House tainted the administrative process.

71.     Extraneous facts impermissibly intruded into the calculus of considerations of the decision-makers, which resulted in prejudice to Plaintiffs.

72.     Defendants' sudden change in position and "return" of the submitted Tribal-State Agreement was motivated in whole, or in part, by improper and undue political influences, pressures, and considerations that were directed at Defendants' key decision-makers. Absent those improper and undue political influences, pressures, and considerations, Defendants would have approved the Tribal-State Agreement.

73.     Because Defendants' "return" of the Tribal-State Agreement was motivated in whole, or in part, by political influence, Defendants' actions were arbitrary, capricious, an abuse of discretion, and not in accordance with law.

74.     Plaintiffs seek a declaratory judgment that the Defendants' "return" of the submitted Tribal-State Agreement was agency action or inaction that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and an order setting aside the agency action and remanding the action to Defendants with instructions to approve the Tribal-State Agreement and publish it in the Federal Register forthwith.

## Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that the Court:

1.     Declare that the Defendants' inaction in failing to approve or consider approved the Tribal-State Agreement to be arbitrary and capricious;

2.     Order a remand to the Department with a mandate to approve the Tribal-State Agreement and directing the Secretary to publish forthwith notice of approval of the Tribal-State Agreement in the Federal Register;

3.      Issue an order or writ compelling the Secretary to immediately publish notice

of approval of the Tribal-State Agreement in the Federal Register;

4.      Retain jurisdiction until the Defendants have completed their court-ordered

obligations; and

5.      Grant Plaintiffs such further and additional relief as the Court may determine is

just and proper.


Dated: February 20, 2019            Respectfully submitted,

                                    KILPATRICK TOWNSEND &
                                    STOCKTON LLP

                                    /s/  Keith M. Harper
                                    Keith M. Harper, Bar No. 451956
                                    KHarper@kilpatricktownsend.com
                                    Catherine F. Munson, Bar No. 985717
                                    cmunson@kilpatricktownsend.com
                                    607 14th Street, N.W., Suite 900
                                    Washington, D.C.  20005
                                    Telephone:  202-508-5800
                                    Facsimile:  202-508-5858

                                    *Attorneys for Plaintiff*
                                    *Mashantucket Pequot Tribe*


                                    STATE OF CONNECTICUT

                                    /s/  Mark. F. Kohler
                                    Mark F. Kohler
                                    Assistant Attorney General
                                    Mark.Kohler@ct.gov
                                    Michael K. Skold
                                    Assistant Attorney General
                                    Michael.Skold@ct.gov
                                    Connecticut Office of the Attorney General
                                    55 Elm Street, P.O. Box 120
                                    Hartford, CT  06141-0120
                                    Telephone:  860-808-5020

Facsimile:  860-808-5347

*Attorneys for Plaintiff*
*The State of Connecticut*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2019, I electronically filed the foregoing First

Amended Complaint with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all counsel of record.

<div style="margin-left:45%">

/s/  Keith M. Harper

Keith M. Harper, Bar No. 451956
KHarper@kilpatricktownsend.com
KILPATRICK TOWNSEND &
STOCKTON LLP
607 14th Street, N.W., Suite 900
Washington, D.C.  20005
Telephone:  (202) 508-5800

</div>